**14-1227**

---

# In The

# UNITED STATES COURT OF APPEALS

# FOR THE FEDERAL CIRCUIT

### EM LOGGING,

*Appellant,*

v.

### DEPARTMENT OF AGRICULTURE,

*Appellees.*

## APPEAL FROM CIVILIAN BOARD OF CONTRACT APPEALS

———————————

## *BRIEF OF APPELLANT*

———————————

R. Allan Payne
DONEY CROWLEY P.C.
Diamond Block, Suite 200
44 West 6th Avenue
P.O. Box 1185
Helena, MT  59624-1185
Telephone:  (406) 443-2211
Facsimile:  (406) 449-8443
Email:  rpayne@doneylaw.com
*Attorneys for Appellant*

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, the undersigned counsel for Appellant hereby certifies that:

1.      The full name of every party or amicus represented by me is:  EM Logging.

2.      The name of the real party in interest represented by me is:  EM Logging.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: None.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or are expected to appear in this court are:  Tonn K. Peterson and Robert A. Maynard, Perkins Coie LLP.

Respectfully Submitted,

DONEY CROWLEY P.C.

Dated:  April 24, 2014                    By:  /s/ R. Allan Payne
                                                    R. Allan Payne

i

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTEREST…………………………………….…    i

TABLE OF CONTENTS…………………………………………….    ii

TABLE OF AUTHORITIES…………………………………………....    v

STATEMENT OF RELATED CASES…………………………………    viii

STATEMENT OF JURISDICTION………………………………….....    1

STATEMENT OF ISSUES…………………………………………..    1

STATEMENT OF THE CASE INCLUDING
STATEMENT OF RELEVANT FACTS………………………………….    2

      Facts Regarding Alleged Breach for Overweight Loads…………    5

      Facts Regarding Alleged Breach of Designated Haul Routes……    8

      Facts Regarding Alleged Breach for Failure to Give
      Delay Notices…………………………………………………    9

      Procedural Facts………………………………………………….    11

SUMMARY OF THE ARGUMENT………………………………...    13

     A.    CBCA erred in determining that the alleged
           violations could form the basis for termination
           of the contract………………………………………..    13

     B.    CBCA erred in determining that the alleged
           Breaches were material breaches of the contract………….    13

     C.    CBCA erred in determining that the alleged
           Violations were a flagrant disregard of the
           contract terms……………………………………………    14

D.     CBCA's conclusion of law as to the Agency's
       burden of proof constitutes legal error…………………     15

ARGUMENT……………………………………………………     15

I.     Introduction……………………………………………….     15

II.    Standard of Review……………………………………….     15

III.   Analysis………………………………………………....     16

       A.     CBCA erred in determining that the alleged
              violations could form the basis for termination
              of the contract………………………………………     16

       B.     CBCA erred in determining that the alleged
              Breaches were material breaches of the contract…..     20

              1.    CBCA erred in determining there was
                    a haul route violation of the contract……….     20

              2.    CBCA erred in determining that the
                    notification requirement of the contract
                    was breached……………………………     22

              3.    CBCA erred in determining that load
                    limits in the contract were breached…………     23

                    a.    CBCA erred by ignoring the
                          practical construction of the
                          contract by the Agency and
                          Mr. Miller……………………………..     24

                    b.    The 1986 Order from Kootenai
                          National Forest Supervisor does
                          not justify denial of Mr. Miller's
                          appeal……………………………….     27

                    c.    CBCA erred by upholding the
                          Agency's termination of the
                          contract that was based upon a
                          patently wrong interpretation of
                          applicable Montana law………………     31

C.    CBCA erred in determining that the alleged
violations were a flagrant disregard of the
contract terms………………………………………….    35

    1.    Alleged load limit violations do not
constitute "flagrant disregard" of the
contract terms…………………………………    36

    2.    Haul route deviations and delayed
notifications of delay do not constitute
"flagrant disregard."……………………….....    38

D.    CBCA's conclusion of law as to the Agency's
burden of proof constitutes legal error………………    39

CONCLUSION AND RELIEF REQUESTED……………………………. 41

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page**

## Cases

*American Medical Systems, Inc. v. Medical Engineering Corp.*,
6 F.3d 1523 (C.A. Fed., 1993) ...................................................16

*Blinderman Const. Co. v. U.S.*,
695 F.2d 552 (Fed.Cir., 1982)...................................................24

*Carnes Co. v. Stone Creek Mechanical, Inc.*,
412 F.3d 845 (7th Cir., 2005)....................................................21

*Dalles Irrigation District v. U.S.*,
82 Fed. Cl. 346 (Fed.Cl., 2008)...........................................24, 28

*Deutsche Bank AG v. U.S.*,
742 F.3d 1378 (C.A. Fed., 2014)...............................................16

*Federal Power Commission v. Texaco, Inc.*,
417 U.S. 380 (1974)..................................................................29

*Goldberg v. Kelly*,
397 U.S. 254 (1970)..................................................................29

*Lisbon Contractors, Inc. v. U.S.*,
828 F.2d 759 (Fed.Cir., 1987)..............................................16, 40

*McHugh v. DLT Solutions, Inc.*,
618 F.3d 1375 (C.A. Fed., 2010).........................................16, 35

*McPherson v. Woods*,
506 Fed.Appx. 379 (6th Cir., 2012) ....................................21, 24

*Minneapolis Auto Parts Co., Inc. v. City of Minneapolis*,
572 F.Supp. 389 (D.Minn., 1983) ............................................29

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983).....................................................................29

*Old Colony Trust Co. v. City of Omaha*,
  230 U.S. 100 (1913) ..................................................................................24

*Oregon Woods, Inc. v. Salazar*,
  355 Fed.Appx. 403 (C.A. Fed., 2009) .........................................................16

*Pearson v. Thompson*,
  141 F. Supp. 2d 105, (D.D.C., 2001).............................................................28

*Ryste & Ricas, Inc. v. Harvey*,
  477 F.3d 1337 (C.A. Fed., 2007).................................................................16

*Securities and Exchange Commission v. Chenery Corp.*,
  318 U.S. 80 (1943).....................................................................................29

*Tincher v. Piasecki*,
  520 F.2d 851 (7th Cir.,1975).......................................................................29

**Statutes**

28 U.S.C. §1295(a)(10) ................................................................................ 1

41 U.S.C. §7101, *et seq.*...............................................................................15

41 U.S.C. §7107(a)(1)................................................................................... 1

41 U.S.C. §7107(b)(1) ..................................................................................16

41 U.S.C. §7107(c) .......................................................................................43

Mont. Code Ann. § 61-10-201 ......................................................................33

Mont. Code Ann. § 61-10-107 .................................................................passim

**Rules**

Federal Circuit Rule 47.5 ............................................................................. vii

**Treatises**

Williston on Contracts § 32:14 (4th ed.) (1999) ...........................................24

**Other Authorities**

*Merriam-Webster's Collegiate Dictionary,* (11th Edition, 2006)………………35

## STATEMENT OF RELATED CASES

Appellant EM Logging, pursuant to Federal Circuit Rule 47.5, by and through the undersigned counsel of record, affirmatively states that no other appeal from the proceeding before the Civilian Board of Contract Appeals was previously filed before this or any other appellate court.

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §1295(a)(10) and 41 U.S.C. §7107(a)(1).  The Order of the Civilian Board of Contract Appeals ("CBCA"), CBCA 2397, 2427, dated June 18, 2013, became a final order upon the denial of EM Logging's Motion for Reconsideration by the CBCA on September 16, 2013.

## STATEMENT OF ISSUES

1.     Did the CBCA commit legal error when it concluded, contrary to the plain and unambiguous terms of the Big Steep Contract, that the cited repeated Notifications of Breach were sufficient basis for the Agency to terminate the contract?

2.     Did the CBCA commit legal error when it concluded, plainly contrary to the applicable and cited statutes, and contrary to the practical construction of the Big Steep Contract by the contracting parties, that EM Logging violated the haul route, that EM Logging violated the delay notification requirement, and that a blanket 80,000-pound load limit applied to EM Logging's trucks under the terms of the contract pursuant to a 1986 Forest Supervisor's Order, which was not relied on by either party, in place of the relied-upon Montana state statute?

3.     Did the CBCA commit legal error when it concluded that, as a matter of law, EM Logging's purported and unsubstantiated violations amounted to a

1

"flagrant disregard" of the Big Steep Contract terms so as to provide sufficient

basis for terminating the contract?

4.     Did the CBCA commit legal error when it concluded, as a matter of

law, that the Agency met its burden of proof regarding the correctness of the

decision to terminate the Big Steep Contract?

## STATEMENT OF THE CASE
## INCLUDING STATEMENT OF RELEVANT FACTS

EM Logging is a sole proprietorship logging company owned and operated

by Enos Miller ("Mr. Miller").  EM Logging is headquartered in Eureka, Montana,

and has been in the timber harvesting business for approximately 25 years.

(A002221 – 2222).

Mr. Miller has been awarded 20 to 30 timber sale contracts by the U.S.

Forest Service ("Agency").  (A002221 – 2222).

On August 31, 2010, Mr. Miller was awarded the Big Steep Timber Sale

Contract.  (A000587 – 736).

Pursuant to the terms of the contract, Mr. Miller was to purchase, harvest

and remove approximately 12 million board feet of federal timber from the Big

Steep timber sale area.  (A002227).

Philip Emery was designated as the contracting officer under the contract,

entered into the contract on behalf of the Agency and supervised all aspects of

2

administration of the contract.  (A001961 – 1962).  The contracting officer was required to issue a "notification of breach of contract" if he determined there had been a violation of the contract terms.  (A002084, A001211 (¶B9.3)).

Phillip Emery has been a contracting officer for more than 10 years.  At the hearing, he admitted there had been instances under other contracts in which a timber sale purchaser violated the terms of a timber sale contract and was not issued a notification of breach.  (A002083).  Verbal warnings can and have been given.  (A002083).  Additionally, written warnings can and have been given.  (A002083 – 2084).  The contracting officer gave no verbal or written warnings to Mr. Miller.  (A002084 – 2085).

Over a short period of time, the contracting officer issued six Notifications of Breach to Mr. Miller asserting violations of the Big Steep Contract.  The first, issued November 4, 2010, had to do with cleaning of equipment and servicing, an issue the CBCA found Mr. Miller prevailed on, and which was not appealed by either party.  (A000029, A000162 – 164).

The second Notification of Breach, issued November 30, 2010, had to do with road snow plowing.  (A000056, A000810 – 811).  The CBCA found that Mr. Miller timely and properly responded to this Notification by plowing the roads.  (A000027).

3

The third and fourth Notifications of Breach were both issued January 14, 2011 with respect to the route of haul and use of roads (overweight loads). (A000056, A000239 – 243).

The fifth Notification of Breach was issued January 21, 2011 regarding road use, and included a Notification of Suspension of Operations. (A000056, A000257 – 258). Mr. Miller received the third, fourth, and fifth Notifications of Breach, together with the Notification of Suspension, on January 22, 2011. (A000056, A000239 – 241, A000242 – 243 and A000257 – 258).

The sixth Notification (a failure to pay) was issued March 2, 2011—well after Mr. Miller's suspension had been issued. (A000322 – 323).

The March 11, 2011 Notification of Termination for Breach was based upon Mr. Miller's alleged "flagrant disregard" of the Big Steep Contract terms, citing the six Notifications of Breach as the bases for termination for the alleged "flagrant disregard" of the terms of the contract. (A000056 – 60). However, the first Notification of Breach was determined in Mr. Miller's favor by the CBCA and, thus, cannot serve as a basis for termination. (A000029). Likewise, the CBCA found that Mr. Miller timely and properly responded to the second Notification by plowing the roads and, therefore, did not rely on that Notification for its determination that termination was appropriate. (A000027). The CBCA's decision relied only upon the third, fourth, and fifth Notifications, including the

4

Suspension of Operations in the fifth Notification, and concluded that the Agency

properly terminated Mr. Miller's Big Steep Contract. (A000029). Specifically, the

CBCA found that that the record established violation of contractual requirements

only as to (1) weight limits, (2) haul routes, and (3) notices of delay, and those

amounted "to blatant and flagrant violations of material contractual provisions."

*Id.* The Agency chose not to appeal the decision of the CBCA and, therefore, these

three bases are all that support the CBCA's finding.

**Facts Regarding Alleged Breach for Overweight Loads:**

Clause C5.12 of the Big Steep Contract requires that logging trucks must

comply with "statutory load limits" while hauling on Big Creek Road (a/k/a Road

336) between its junction with Road 255 and Road 228. (A001217). Federal

statutes impose load limits for interstate highways, but none of Mr. Miller's log

hauls were on interstate highways. Instead, all log hauls took place on Forest

Service roads or Montana state highways. (A000110, A000967 – 968).

Mont. Code Ann. § 61-10-107 determines maximum allowable load limits

based upon a formula that takes into account the configuration of length and

number of axles of a truck and trailer. The Montana Department of Transportation

("DOT") has developed a chart that graphically depicts the formula in § 61-10-107.

There is no reference to an 80,000-pound load limit in that statute. (A001664 –

1666).

Both parties testified that they understood the "statutory load limits" to be a reference to Montana state law and, specifically, the load limits as detailed in Mont. Code Ann. § 61-10-107.  (A002028 – 2029, A002114, A002137 – 2138, A000267, A000983, A002320 – 2321).

In November 2010, Mr. Miller owned three trucks. The length of each truck was 50 feet.  Additionally, each of the three trucks could be "stretched out" or lengthened to 70 feet long.  (A002318, A002323).

Mr. Miller also had five trailers that could be hooked up to any one of the three trucks.  (A002319 – 2320).  By connecting a trailer to a logging truck, the overall length and the number of axles would increase, thereby increasing the load limit for the truck allowed by § 61-10-107.  (A001664 – 1666).

One of the January 14, 2011 Notifications of Breach was issued for Mr. Miller's alleged non-compliance with the weight limit clause.  That Notification was based on scale tickets generated at the mill, which was the destination of the logs.  (A000239 – 241).  In the Notification, the contracting officer lists seven truckloads that he claims "significantly exceeded the legal gross vehicle weight limit."  However, the Notification did not list or describe the length and number of axles of each truck and no evidence was offered at the hearing as to the length or number of axles for any of the trucks with allegedly overweight loads.  (A000239 – 242).

6

One overweight load was established in the record.  On January 20, 2011, an employee of Mr. Miller was driving a logging truck from the sale area to a designated weigh station when he was stopped by a Montana DOT officer. (A002192).  The DOT officer issued the employee a ticket for driving an overweight truck.  (A002184 – 2188).  The reason that load was overweight was that the employee had loaded the logging truck with logs at the sale area and, for safety reasons, had "shortened up" the logging truck to navigate the winding Forest Service Road leading from the sale area to the state highway.  (A002194 – 2195).

The employee intended to "lengthen" the truck to its fully extendable length upon reaching the state highway, but simply forgot to do so.  (A002188 – 2190). Had the employee remembered to "lengthen" the truck upon reaching the state highway, the truck would have been within the allowable Montana statutory load limit.  (A002188).  Instead Mr. Miller was issued his sole citation for an overweight load by the DOT on January 20, 2011.

The January 21, 2011 Notification of Breach was based upon a January 20, 2011 citation by the DOT.  (A000257 – 258).   The contracting officer asserted  in the Notification that Mr. Miller's conduct constituted a flagrant disregard for the terms of the contract, he suspended all operations under the contract at that time and stated he would consult with the Regional Forester regarding termination of the contract.  (A000257 – 258).  The Contract was Terminated on March 11, 2011,

7

with no additional work completed after the January 21 suspension, nor any opportunity provided by Mr. Miller to cure the alleged breaches.  (A000056 – 60).

**Facts Regarding Alleged Breach of Designated Haul Routes:**

Clause C6.849 of the contract states in pertinent part that:

> … Purchaser shall furnish Forest Service a map and a written general plan for hauling timber from Sale Area. The plan shall set forth (a) Designated haul route(s) and (b) Designated weight scales.

> … All products removed from the Sale Area shall be transported over the designated routes of haul. Purchaser shall notify Forest Service when a load of products, after leaving the Sale Area, will be delayed for more than 12 hours in reaching the weighing station.

(A000668).

Mr. Miller presented a haul route map to the contracting officer on November 2, 2010 with various roads on the map highlighted showing those routes Mr. Miller proposed to use in transporting logs from the sale area.  (A002294 – 2295, A000110).  This is the procedure Mr. Miller had followed for nearly 25 years in working with Agency timber sale contracts.  (A002294).

Highway 93, traveling north and south to Eureka, Montana, was included on the haul route map.  (A000110, A002300).  Based on the contracting officer's discussion of the map with Mr. Miller on November 2, 2010, it was clear that he knew and understood that Highway 93 was part of the haul route.  (A002298).

8

In addition to the haul route map, Mr. Miller was also required to submit a written plan detailing the haul route. (A000068). The contracting officer later rejected one portion of the written haul route due to the lack of an approved scale at that site, but approved the haul route map Mr. Miller submitted at the November 2, 2010 meeting. (A002123, A002295 – 2296).

Mr. Miller's logging trucks did not deviate from the designated route of haul (as illustrated on the haul route map agreed to by the parties) while performing under the contract. (A002303 – 2304). However, Mr. Miller was not told that Highway 93 to Eureka was not part of the approved route of haul until he received the Notification of Breach for the alleged deviation from the route of haul. (A002301 – 2302).

**Facts Regarding Alleged Breach for Failure to Give Delay Notices:**

Clause C6.849 of the contract states, in pertinent part, that the "[P]urchaser shall notify Forest Service when a load of products, after leaving Sale Area, will be delayed for more than 12 hours in reaching weighing location."

Mr. Miller had 12 log loads that were delayed for more than 12 hours in route from the sale area to the weighing station. For each delayed load, Mr. Miller notified the contracting officer via email or text message as required by the contract. (A002305 – 2310). The contract provides no specific time frame by which notification was required, and Mr. Miller provided notification as soon as

practicable.  Mr. Miller would often be working in the forest upon learning of a

delay—sometimes up to 100 miles from home and without cell phone service.

There is no cell phone service at the Sale Area.  As soon as Mr. Miller found out

that a product load would be delayed for more than 12 hours, Mr. Miller always

notified Mr. Emery.  (A002305 – 2310).

The 12 delayed log loads were due to weather conditions, state highways not

being plowed, a sick truck driver, and DOT restrictions that prohibit truck drivers

from logging more than 12 hours of driving time per day.  (A002310 – 2311).

Because the Sale Area was so far from the weighing station and in light of

the snowy conditions prevalent in the region that made driving time slow and

certain DOT regulations that limited driving time altogether, Mr. Miller asked the

contracting officer to extend the 12-hour delay requirement to 24 hours.  This

request was denied.   (A002311 – 2312).

On January 14, 2011, the contracting officer issued a Notification of Breach

to Mr. Miller, citing 12 log loads that were delayed for more than 12 hours in

transit to the approved weigh station, some of which he claimed were transported

"13 miles off of the approved haul route and over-nighted in Eureka."  (A000242 –

243).  Mr. Miller received this Notification at the same time he received a Notice

of Suspension of the contract and, thus, was not given an opportunity to address

10

the issues described therein.  (A000239 – 241, A000242 – 243, and A000257 –

258).

**Procedural Facts:**

On January 22, 2011, Mr. Miller received two Notifications of Breach dated

January 14, 2011, and a Notification of Breach and Suspension of Operations dated

January 21, 2011.  (A000239 – 241, A000242 – 243, and A000257 – 258).

On March 11, 2011, the contracting officer issued a Notification of

Termination for Breach for the Big Steep Contract based upon Mr. Miller's alleged

"flagrant disregard" for the contract terms.  (A000056 – 60).

Mr. Miller initially appealed to the CBCA from the decision of the

contracting officer issued in connection with the Big Steep Contract denying his

request for reimbursement of $1,050.00 incurred in transporting and rewashing

equipment that had previously been washed and approved by the Agency, as well

as related attorney fees and costs.  This appeal was docketed as CBCA 2397.

Mr. Miller subsequently appealed to the CBCA from the Notification of

Termination dated March 11, 2011.  Mr. Miller requested declaratory and

monetary relief, as well as related attorney fees, and requested that this subsequent

appeal be consolidated with the previous appeal in CBCA 2397.  This subsequent

appeal was docketed as CBCA 2427.

11

Mr. Miller timely filed complaints with the CBCA based upon the appeals. On June 29, 2011, the CBCA granted Mr. Miller's request to consolidate CBCA 2397 and CBCA 2427.

CBCA conducted an evidentiary hearing on October 2 and 3, 2012 with Board Judge R. Anthony McCann presiding. On June 18, 2013 CBCA issued its Order (CBCA 2397, 2427 *EM Logging, Appellant v. Department of Agriculture, Respondent*) granting entitlement as to Mr. Miller's appeal in CBCA 2397 and denying Mr. Miller's appeal in CBCA 2427, with Presiding Board Judge R. Anthony McCann dissenting (*see* Addendum).

In denying Mr. Miller's Appeal in CBCA 2427, the CBCA concluded that a blanket statutory load limit of 80,000 pounds applied under the terms of the Big Steep Contract, and Mr. Miller's alleged violations of that load limit, as well as his alleged violations of the designated haul route and delays in notifying the Agency of haul delays, amounted to a "flagrant disregard" of the contract terms. The dissent of Judge McCann took exception to the conclusion that a blanket load limit applied under the contract and concluded that, under the circumstances, the alleged violations by Mr. Miller did not amount to a "flagrant disregard" of the contract terms and, therefore, the Agency did not meet its burden of proof on the correctness of termination.

12

Following the CBCA's September 26, 2013 denial of Mr. Miller's Motion to
Reconsider, Mr. Miller timely filed a Petition for Review of the CBCA decision in
CBCA 2427, which was received by this Court on January 2, 2014.

## SUMMARY OF ARGUMENT

### A.  CBCA erred in determining that the alleged violations could form the basis for termination of the contract.

CBCA erred as a matter of law in determining that the alleged repeated
"violations," if any, could form the basis for termination of the Big Steep Contract,
when the contract explicitly references *repeated* "suspensions" as basis for
termination, and where the CBCA's decision to affirm the termination was
supported by only *one* "suspension" of the contract by the contracting officer.

### B.  CBCA erred in determining that the alleged breaches were material breaches of the contract.

CBCA erred as a matter of law in determining that the alleged breaches
were, in reality, material breaches of the contract.  Mr. Miller did not deviate from
the accepted haul routes, other than one time by a sick employee.  Mr. Miller
always gave notice of delay to the contracting officer as soon as possible given the
circumstances of the job site—located in remote northwestern Montana, many
miles from a cell phone signal and/or service.  Finally, CBCA erred as a matter of
law in determining that a blanket 80,000 pound load limit applied to Mr. Miller's
logging trucks carrying loads under the terms of the Big Steep Contract.

13

The CBCA's linchpin conclusion of law that a blanket statutory load limit of 80,000 pounds applied to Mr. Miller's logging trucks under the contract is a misstatement of the applicable statutory load limits under the relied-upon Montana law and, thus, clearly reversible legal error. Further, CBCA compounded this legal error by (1) ignoring the practical construction of the Big Steep Contract by Mr. Miller and the Agency as the contracting parties; (2) creating its own basis upon which to deny Mr. Miller's appeal from an item in the appeal record not relied upon at any time or argued by the Agency; and (3) placing credence in a patently wrong interpretation of the applicable statute by the Agency, which denied Mr. Miller an opportunity to refute and rebut the basis.

**C.      CBCA erred in determining that the alleged violations were a flagrant disregard of the contract terms.**

The CBCA erred as a matter of law in determining that the purported violations by Mr. Miller amounted to "flagrant disregard" of the terms of the Big Steep Contract. The alleged violations by Mr. Miller, if they occurred, are not as a matter of law so obviously inconsistent with the terms of the contract, or so conspicuously offensive to the contract, as to amount to a "flagrant disregard" of the contract terms sufficient to form the basis for a termination notice. As such, CBCA erred in determining that the contract could be terminated on the bases proffered by the contracting officer.

14

**D.    CBCA's conclusion of law regarding the Agency's burden of proof constitutes legal error.**

The CBCA's conclusion of law that the Agency met its burden of proof as to the correctness of the termination of Mr. Miller's Big Steep Contract cannot be sustained and constitutes legal error.

## ARGUMENT

## I.    INTRODUCTION

The CBCA's conclusion that Mr. Miller was in flagrant disregard of the terms of the Big Steep Contract and therefore its determination that the Agency's termination of the contract was warranted (*see* A000030), is fraught with error and should be reversed.  Specifically, the CBCA erred in interpreting the terms of the Big Steep Contract, erred in its application of Montana law to that contract, erred in applying a violation basis not articulated by the Agency or the contracting officer, erred in determining that the purported violations by Mr. Miller, if any, were so pervasive as to amount to "flagrant disregard" of the contract's terms, and erred in determining that the Agency had met its burden of proof, as described more fully below.

## II.    STANDARD OF REVIEW

Disputes about timber sale contracts with the United States Forest Service are governed by the Contract Disputes Act of 1978, *see* 41 U.S.C. §7101, *et seq.*

Contract interpretation under the Contract Disputes Act is a question of law reviewed de novo "with 'no deference owing to the interpretation adopted by either the agency or the [reviewing board of contract appeals].'" *McHugh v. DLT Solutions, Inc.*, 618 F.3d 1375, 1379 (C.A. Fed., 2010) (internal citations omitted).

The CBCA's conclusions of law are reviewed de novo and without deference. *See*, *Oregon Woods, Inc. v. Salazar*, 355 Fed.Appx. 403, 404 (C.A. Fed., 2009); *Ryste & Ricas, Inc. v. Harvey*, 477 F.3d 1337, 1340 (C.A. Fed., 2007); 41 U.S.C. §7107(b)(1).    *Oregon Woods, Inc. v. Salazar*, *id*.

Statutory interpretation by the CBCA is likewise a question of law to be reviewed de novo. *See*, *Deutsche Bank AG v. U.S.*, 742 F.3d 1378, 1381 (C.A. Fed., 2014); *American Medical Systems, Inc. v. Medical Engineering Corp.*, 6 F.3d 1523, 1534 (C.A. Fed., 1993). The Agency bears the burden of proof on the issue of the correctness of the termination of the Big Steep Contract. *See*, *Lisbon Contractors, Inc. v. U.S.*, 828 F.2d 759, 765 (Fed.Cir., 1987).

III.    **ANALYSIS**

    A.    <u>**CBCA erred in determining that the alleged violations could form the basis for termination of the contract**</u>.

As an initial matter, the CBCA's decision relies entirely upon a misrepresented contractual basis by which the Agency was allowed to terminate the Big Steep Contract. Timber sale contracts are complicated and allegations of

breaches by the purchaser can easily be made.  As a counterbalance, the Big Steep

Contract provides important protections to the purchaser, in that it affords ample

opportunity to address alleged breaches.  If the Agency alleged Mr. Miller was in

breach of a material provision of the contract, the Agency was required to give Mr.

Miller notice of such breach, and then allow a reasonable time (usually 30 days)

for Mr. Miller to remedy the breach.  (A001211).  Thereafter, and only if the

breach was not remedied after a reasonable time, the contract provided that the

Agency may suspend the contract.  *Id*.  Only after a party has been given at least 30

days to remedy a suspension does the Big Steep Contract provide that the contract

could properly be terminated, and only if the Agency could demonstrate that Mr.

Miller "engaged in a pattern of activity that demonstrates flagrant disregard for the

terms of this contract, such as, but not limited to, repeated suspensions for breach...

."  (A000028, A001211).  This is the only contractual basis for termination relied

upon by the Agency and the only one cited by the CBCA in its Order.  *Id*.

 And, in fact, this is the procedure that was initially followed by the Agency.

On November 30, 2011, the Agency issued a Notification of Breach and

Suspension of Operations faulting Mr. Miller for his allegedly inadequate snow

plowing.  (A000810 – 812).  In response thereto, and as the CBCA affirmatively

found, Mr. Miller timely addressed the concerns and within two weeks was

"properly plowing roads."  (A000027).

17

While the CBCA found that the November 30 Notification was not a basis for termination, the CBCA nonetheless found that the requirements of termination recited at § B9.31(c) were met, and that the Agency properly terminated the Big Steep Contract because Mr. Miller "repeatedly violated contractual requirements" by purportedly violating (1) weight limits, (2) haul routes, and (3) notice of delay provisions of the contract in order to conclude that "[t]hese amount to blatant and flagrant violations of material contractual provisions." (A000030). However, under the Big Steep Contract, the Agency was not allowed to terminate the contract for repeated violations, only for repeated suspensions. Therein is the CBCA's first error. Its decision conflates the "repeated suspensions" referenced in the Big Steep Contract as sufficient reason to terminate with the "repeated violations" it found Mr. Miller had committed. The "repeated violations" CBCA cited were related to a single notice of suspension, not the "repeated suspensions for breach" required under the contract.

This determination is in direct contravention of the contract's clear and unambiguous mandates and is, thus, reversible legal error. Under the Big Steep Contract, the Agency was not allowed to terminate the contract for repeated violations. Instead, the Agency was only allowed to terminate when it had issued repeated notices of violation, given opportunity to cure, thereafter repeatedly suspended the contract, and when the purchaser failed to cure thereafter.

18

(A001211).  Here, Mr. Miller was issued a number of notices of violation.

However, he was issued only three suspensions, one of which he prevailed on

before the CBCA and one of which the CBCA acknowledged was timely

remedied—thus neither were relied upon by the CBCA in determining Mr. Miller

in "flagrant disregard" of the contract (A000027, A000029) before eventual

termination.

Further, Mr. Miller received the Notifications of Breach as to load weights

and use of roads on the very same day he received his suspension on that same

basis—effectively denying him his right to a 30-day opportunity to remedy the

alleged breaches as required by §B9.3 of the contract.  (A000239 – 241, A000242

– 243, A000257 – 258).  Such repeated notices of violation, even if taken as true,

together with a single unremedied suspension relied on by the CBCA, all of which

were received on the same date, failed to give Mr. Miller the required opportunity

to remedy the alleged breaches, and do not and cannot under the contract form a

valid basis for the Agency's termination of the contract as a matter of law.  As

such, the Court should reverse the CBCA's determination.  Moreover, as described

more fully below, the CBCA's determination that these purported breaches and

notices of violation were correct is also error, and the purported breaches and

notices do not amount to material breach of the Big Steep Contract in any case.

**B.    CBCA erred in determining that the alleged breaches were material breaches of the contract.**

The CBCA's determination upholding the Agency's decision to terminate the Big Steep Contract with Mr. Miller is flawed, as it is clear that the Agency failed in its burden of proving that the noticed violations actually occurred under the terms of the contract and the applicable statutory regime referenced therein. As explained more fully below, this Court should overturn the CBCA's decision as it constitutes error of contract interpretation, as well as an error of law in interpreting Montana statutes.

**1.  The CBCA erred in determining there was a haul route violation of the contract.**

The Agency's first January 14, 2011 Notification of Breach to Mr. Miller took Mr. Miller to task for alleged deviations from the designated haul routes. (A000242). However, contrary to the Agency's assertion, with the exception of one use of the road by a sick employee, Mr. Miller did not deviate from the haul route presented to and approved by the Agency. (A002299 – 2304).

Clause C6.849 of the contract required Mr. Miller to submit a haul route map and a written plan for hauling logs. (A000668). Mr. Miller furnished a haul route map and a written haul route plan to the Agency. (A000110, A000113, A000137, A000139). The haul route map was accepted by the Agency. (A002295, A002301). The written haul route was, likewise, accepted, although

20

Mr. Miller's request to designate one location as a scaling station was not accepted due to the lack of an acceptable weigh scale. (A000137, A000139, A002066 – 2067). Mr. Miller testified without refutation that his logging trucks did not deviate from the haul route as shown on the haul route map. (A002303 – 2304).

Mr. Miller also testified, again without refutation, that the only deviation from the haul route was due to one of Mr. Miller's drivers being forced to turn his loaded truck around when he was stricken by illness. (A002299 – 2300).

Judge McCann—who was the only member of the CBCA panel to conduct the evidentiary hearing and actually hear testimony—observed the proffered witnesses and deemed Mr. Miller's testimony credible. (A000039). Despite this, the CBCA majority (who did not hear the witness) nevertheless discounted Mr. Miller's testimony. (A000026). In so doing, the CBCA majority erred as a matter of law, as deference should always be given to the trial judge's determination of credibility as it is the trial judge who can observe witnesses and weigh testimony accordingly. *See*, *McPherson v. Woods*, 506 Fed.Appx. 379, 388-389 (6th Cir., 2012); *Carnes Co. v. Stone Creek Mechanical, Inc.*, 412 F.3d 845, 848 (7th Cir., 2005). The refusal of the CBCA majority to defer to the trial judge regarding credibility of witnesses is reversible error. Thus, the Court should overturn the CBCA's decision on this basis.

21

## 2. The CBCA erred in determining that the notification requirement of the contract was breached.

The Agency's second January 14, 2011 Notification of Breach to Mr. Miller also took Mr. Miller to task for alleged delays in notifying the Agency when log loads are delayed more than 12 hours in reaching a weighing location. (A000242).

Clause C6.849 of the contract requires Mr. Miller to give the Agency notice when there is a delay of more than 12 hours from the time of leaving the timber Sale Area until the load reaches a weighing station, but does not specifically require advance notice of such delays. (A000668). The contract does not place any time restraints on providing this notice. *Id.*

Mr. Miller testified, again without refutation, that he always notified the Agency of delays in the delivery of log loads as soon as practicable given the circumstances of working on a timber sale in remote Montana where there was no cellular service for many miles. (A002305 – 2310). Mr. Miller also testified, again without refutation, that one alleged delay in reaching the weighing location for a log load was due to a driver for Mr. Miller being forced to turn his loaded truck around when he became ill. (A002299 – 2300). Mr. Miller also testified, once again without refutation, that loads were sometimes delayed due to DOT regulations limiting the number of hours a truck driver may drive or to weather-related issues. (A002310 – 2312). However, Mr. Miller further testified that he

22

always notified the contracting officer as soon as practicable upon learning of such delays, taking into account the lack of cell phone service in the field. (A002306 – 2308).

As described above, Judge McCann (the only member of the CBCA panel to hear the case) found Mr. Miller's testimony credible. Despite this, the CBCA majority discounted Mr. Miller's testimony. (A000026). As described above, the CBCA thus erred as a matter of law in failing to defer to the trial judge as to Mr. Miller's credibility. *See*, *McPherson v. Woods*, *supra.*

Further, even if the Agency's allegations as to reporting notification delays were accepted and considered to be violations of the contract, these acts are not material breaches of the contract and instead are, at most, only technical violations of the terms of a contract, which were impractical given the nature and location of the contract in remote and isolated northwestern Montana. As such, the CBCA erred as a matter of law in concluding otherwise, and its decision should be reversed.

**3. The CBCA erred in determining that load limits in the contract were breached.**

The CBCA erred in determining that Mr. Miller breached the applicable load limits contained in the Big Steep Contract, as the CBCA improperly ignored the parties' practical construction of the contract, improperly provided its own basis

23

for the breach, and improperly interpreted Montana law in order to affirm the

Agency's finding of a breach of the contract.

>    a. <u>CBCA erred by ignoring the practical construction of the contract by the Agency and Mr. Miller.</u>

First, it is hornbook law that the parties' intent as to the meaning of a

contract term is given great weight and controls interpretation of that contract and,

thus, it was improper of the CBCA to interpret the terms of the Big Steep Contract

on bases not articulated or relied upon by either party, either prior to or after

litigation commenced.  The practical construction of a contract by the parties to it

before the contract becomes the focus of litigation is deemed by the courts to be

"of great, if not controlling, influence" as such construction "evidences what the

parties believed the contract to require before they confronted the prospect of

impending litigation."  *Old Colony Trust Co. v. City of Omaha*, 230 U.S. 100, 118

(1913) (citations omitted); *see also, e.g. Dalles Irrigation District v. U.S.*, 82 Fed.

Cl. 346, 356 (Fed.Cl., 2008) ("The construction of a contract is as much a part of it

as anything else."); *Blinderman Const. Co. v. U.S.*, 695 F.2d 552, 558 (Fed.Cir.,

1982) ("It is a familiar principle of contract law that the parties' contemporaneous

construction of an agreement, before it has become the subject of a dispute, is

entitled to great weight in its interpretation."); *Williston on Contracts* § 32:14 (4th

ed.) (1999) ("Given that the purpose of judicial interpretation is to ascertain the

parties' intentions, the parties' own practical interpretation of the contract—how they actually acted, thereby giving meaning to their contract during the course of performing it—can be an important aid to the court. Thus, courts give great weight to the parties' practical interpretation.").

Here, there is and was no dispute between the parties as to the meaning of "statutory load limits" in the Big Steep Contract. While federal statute imposes weight limits on interstate highways, Mr. Miller's log hauls were to mills in Thompson Falls, Eureka and Libby, Montana, on Forest Service roads and state highways, not interstate highways, and thus federal statutes establishing interstate highway load limits are not the applicable "statutory load limits" in the Big Steep Contract. (A000110, A 000967 – 968). Tellingly, neither party relied on federal statutes, with both understanding instead that Montana's state law controlled the meaning of "statutory load limits" in the Big Steep Contract.

Accordingly, the contracting officer for the Agency without exception referred only to Montana statute (Section 61-10-107, Mont. Code Ann.) when giving Mr. Miller written notification of his purported breach of the contract prior to litigation, and exclusively when proffering his testimony at the CBCA's evidentiary hearing. (A000239 – 241, A002028, A002114, A002137 – 2138). Thus, the Agency's position, prior to and after litigation commenced, was that Mont. Code Ann. § 61-10-107 provided the basis for its notices of violation to Mr.

25

Miller.  Likewise, Mr. Miller also understood the phrase "statutory load limits" in the Big Steep Contract to be a reference to Montana law, and referenced Montana statutory load limits when refuting the contracting officer's basis for the notifications of breach regarding load limits imposed on his logging trucks. (A000267, A000983, A002320 – 2321).

Thus, by the express terms of the Big Steep Contract and by the actions and interpretations of both the Agency and Mr. Miller in implementing that contract, both during the operation of the contract prior to litigation and after litigation commenced, the only "statutory load limits" that apply under the terms of the contract to determine "flagrant disregard" as to load limits are those of § 61-10-107, Mont. Code Ann.

Section 61-10-107 (as noted by the CBCA majority, A000023) determines the maximum allowable weights of trucks and trailers on affected roads based upon a formula that takes into account the configuration of the length and number of axles of the truck and trailer.  Further, as described *infra*, and contrary to the CBCA's conclusion of law, Section 61-10-107 contains no blanket weight limit of 80,000 pounds and, thus, the conclusion of the CBCA that a blanket load limit of 80,000 pounds exists and that Mr. Miller has violated such limit is legal error. (A000030).

26

b. <u>The 1986 Order from the Kootenai National Forest Supervisor does not justify denial of Mr. Miller's appeal</u>.

In affirming the Agency's determination that Mr. Miller violated the terms of the Big Steep Contract, the CBCA *sua sponte* relied upon a 1986 Order issued by the Agency's Kootenai National Forest Supervisor to further justify its affirmation of the termination of the Big Steep Contract and, in doing so, the CBCA again committed legal error. Because both the Agency and Mr. Miller in their practical application of the contract interpreted the phrase "statutory load limits" to mean a reference to Montana statutes, it was entirely improper for the CBCA to rely on any other basis for determining the meaning of "statutory load limits." This is especially true and of import because, in relying on the 1986 Order, the CBCA depended on an interpretation that neither of the parties articulated, either prior to or during litigation, and thus an interpretation that Mr. Miller was not given any opportunity to refute or explain.

Neither the Agency nor Mr. Miller in their practical construction of the contract relied on, or even mentioned, the 1986 Order; instead, each party accepted Montana statute as determining the "statutory load limits" under the contract. As described more fully in the immediately preceding section, this practical construction of the Big Steep Contract provision regarding load limits by the parties "is reliable and often controlling" as it demonstrates what the parties

27

believed the contract to require.  *See Dalles Irrigation District v. U.S.*, *supra*.  The imposition by the CBCA majority of the Board's own construction of the contract as mandating a blanket load limit in contravention of the practical construction of the contract by the parties is obvious error.

No mention of the 1986 order was made in the Notifications of Breach Mr. Miller was given addressing load limits.  (A000239 – 240).  The 1986 order was not asserted as a defense in the Agency's answers to the complaints Mr. Miller filed with the CBCA.  (A000042 – 49).  The 1986 order was again not relied upon, or even mentioned by, the Agency's contracting officer at the evidentiary hearing before Judge McCann as a justification for any notification of breach issued regarding load limits.  The 1986 order was not offered as a basis for any claimed violation of load limit restrictions in any written argument submitted to the CBCA by the Agency.  (A000035).  The 1986 order was not included as part of the Big Steep Contract.  (A000537 – 736).  While the 1986 order may have been buried in the 1,000-page plus appeal file offered by the Agency, it did not form any articulated basis for the Agency's argument to the CBCA.

"It is the parties' burden to make what they consider their best arguments when they submit their respective briefs," and reference to record material included in the administrative record, but not argued or relied upon by the party, is insufficient to support a post-hoc argument on appeal of a decision.  *Pearson v.*

28

*Thompson*, 141 F. Supp. 2d 105, 109 fn. 6 (D.D.C., 2001). Relatedly, a court (and by analogy a board of appeals acting as a judicial body) "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 43 (1983), *quoting Securities and Exchange Commission v. Chenery Corp.,* 318 U.S. 80, 94 (1943). An agency's decision should be upheld, if at all, on the basis articulated by the agency itself. *Federal Power Commission v. Texaco, Inc.*, 417 U.S. 380, 297 (1974).

By relying upon a portion of the record not relied upon or argued by the Agency or Mr. Miller, the CBCA created its own basis upon which to deny Mr. Miller's appeal. Such action does not comport with the CBCA's judicial role, or with the requirements of due process. *See, e.g. Goldberg v. Kelly*, 397 U.S. 254, 267-71 (1970) (due process requires right to have a decision "based solely on rules of law and the evidence presented at the hearing."); *Tincher v. Piasecki,* 520 F.2d 851, 854 (7th Cir.,1975) ("An essential element of a full and fair hearing is an impartial tribunal which arrives at its decision on the basis of evidence which the accused has an opportunity to confront and rebut."); *Minneapolis Auto Parts Co., Inc. v. City of Minneapolis,* 572 F.Supp. 389, 394 (D.Minn., 1983) (citations omitted) (Due Process Clause "guarantees only that the decision . . . will not be based upon allegations which the individual has not had an opportunity to refute").

29

This failure to provide Mr. Miller due opportunity to address the 1986 order before the CBCA is legal error.

Further, had Mr. Miller been given the opportunity to address the applicability of the 1986 Order, he would have pointed out, as described extensively *supra*, that such document, which did not form the basis of the parties' arguments or interpretation of the contract, is inapplicable, and that it is inappropriate for a Court to make such arguments on behalf of the agency. Moreover, and perhaps of greater import, Mr. Miller would have pointed out that the 1986 order is not even applicable here. While the 1986 Order relied on by the CBCA does prohibit using a vehicle weighing in excess of 80,000 pounds on forest development roads in the Kootenai National Forest, it creates an exception for "persons with a . . . contract specifically authorizing the prohibited act . . . ." (A001146). The 1986 order thus excepts from its scope acts authorized by a contract provision. Here, the Big Steep Contract specifically requires compliance with "statutory load limits," thus creating the exception recognized by the 1986 order. (A000632). As agreed by the parties both prior to and during litigation, the "statutory load limits" referred to are those imposed by Mont. Code Ann. § 61-10-107, which does not impose a blanket weight limit of 80,000 pounds. Thus, the conclusion of the CBCA that a blanket load limit is applicable in reliance upon the 1986 order is in error.

30

Because the 1986 0rder was not relied on or argued by the Agency in issuing its notices of violation, or as a basis for its decision to terminate the contract, or argued in the appeal to the CBCA, because Mr. Miller was not given due opportunity to rebut such purported basis, and because the 1986 Order is not applicable to the Big Steep Contract in any case, the conclusion of the CBCA that an 80,000-pound load limit existed based on the 1986 Order to provide a basis for the Agency's termination is legal error and, therefore, the CBCA decision based upon the 1986 order should be reversed.

    c.  <u>CBCA erred by upholding the Agency's termination of the contract that was based upon a patently wrong interpretation of applicable Montana law</u>.

While the CBCA first erred in determining anything but Mont. Code Ann. § 61-10-107 was applicable to the construction of the term "statutory load limits," it further compounded this error by plainly misinterpreting this section in order to justify the Agency's actions in issuing notices of violation and ultimately terminating the Big Steep Contract.  Mont. Code Ann. § 61-10-107 provides as follows:

(1) (a) An axle may not carry a load in excess of 20,000 pounds, and no two consecutive axles more than 40 inches or less than 96 inches apart may carry a load in excess of 34,000 pounds. An axle load is the total load transmitted to the road by all wheels whose centers are included between two parallel transverse vertical planes 40 inches apart, extending across the full width of the vehicle. For purposes of this section, axles 40 inches or less apart are considered to be a single

axle. Except as provided in subsection (1)(b), the maximum gross weight allowed on a vehicle, group of axles, or combination of vehicles must be determined by the formula:

$$W = 500((LN/(N - 1)) + 12N + 36)$$

in which W equals gross weight, L equals wheelbase in feet, and N equals number of axles, except that two consecutive sets of tandem axles may carry a gross load of 34,000 pounds each if the overall distance between the first and last axles of the consecutive sets of tandem axles is 36 feet or more. The maximum gross weight allowed on a vehicle may not exceed the weight limits adopted by the department. The department shall adopt rules for weight limits based upon the most recent version of 23 CFR, part 658, appendix c, for vehicles operating in Montana.

(b) A vehicle traveling on U.S. highway 93 from the border between Canada and the United States to 10 miles south of the border is subject to the specific maximum allowable gross weight limit provided in rules adopted by the department but is not subject to maximum gross weight limits determined by the formula in subsection (1)(a).

(2) (a) Notwithstanding a vehicle's conformance with the requirements of subsection (1), except for the steering axle, all axles weighing over 11,000 pounds must have at least four tires or have wide-base tires. The maximum load on an axle, other than a steering axle, equipped with wide-base tires is limited to 500 pounds for each inch of tire width.

(b) The provisions of subsection (2)(a) do not apply to passenger buses.

(c) For the purposes of this section, wide-base tires are tires that are 14 or more inches in nominal width. The maximum tire weight limit is computed for wide-base tires based on the number of inches shown on the tire marking, or if the tire marking is shown by metric size, the tire weight limit is computed by conversion of the metric size.

(3) This section does not apply to highways that are a part of the national system of interstate and defense highways (as referred to in 23 U.S.C. 127) when application of this section would prevent this state from receiving federal funds for highway purposes. *(Effective on occurrence of contingency)*

Thus, the statute provides a formula by which maximum gross weights are determined, taking into account the length of the vehicle as well as the number of axles. However, nowhere in this statute, or anywhere else in the Montana Code or in the Montana Department of Transportation's regulations, is there a reference to a blanket 80,000-pound maximum load limit, only a reference to an 80,000 pound threshold for additional heavy equipment fees. Mont. Code Ann. § 61-10-201. Simply put, and contrary to the contracting officer's assertions and the CBCA's conclusions, no such blanket limit exists in Montana.

Both the Agency's contracting officer and the CBCA in affirming the Agency's termination of the Big Steep Contract misinterpreted Section 61-10-107 in order to erroneously issue, and to erroneously affirm the issuance, to Mr. Miller notifications of breach based on statutory weight limits under Montana law. The contracting officer adamantly testified at the CBCA's evidentiary hearing that Montana statute imposes an 80,000-pound load limit on Montana roads and that Montana statute provides the "statutory load limits" of the contract. (A002028 – 2029, A002114, A002137 – 2138). However, as described above, this is clearly a misinterpretation of Section 61-10-107 and, thus, the contracting officer was clearly incorrect in his interpretation of Montana statutes, and incorrect in basing his notification of breach regarding load limits to Mr. Miller upon this incorrect interpretation of the Montana statutes.

33

The contracting officer simply recited the gross weights of the various log loads in the January 14, 2011 Notification of Breach based upon the weight slips for the trucks generated by the destination mill, which stated only the weight of the truck / trailer and load but provided no information regarding truck length or number of axles. (A001027 – 1094). The Notification of Breach generated by the contracting officer did not provide any analysis of vehicle length or axle configuration as required by Section 61-10-107 in order to determine maximum allowable load limits. (A000239 – 240). None of the weight information relied upon by the contracting officer, and then by the Agency, provides an analysis of vehicle length / axle configuration (A000213, A000294, A000951, A000967 – 968, A001027 – 1094, A002056 – 2057), and, further, no such analysis exists in the record before the CBCA. (A002324 – 2325). The contracting officer could not definitely state the length of a standard logging truck. (A002114 – 2115).

As such, without evidence of load length and number of axles, there was no valid basis for the contracting officer to issue notices of violation to Mr. Miller based on Montana law and, thus, no basis to terminate Mr. Miller's contract for "flagrant disregard" of its terms. In fact, the DOT issued only one overweight ticket to Mr. Miller. (A002184 – 2188). Had he been in flagrant disregard of the statutory weight limit, he should have received more DOT tickets. Therefore, the CBCA's affirmation of the Agency's termination of the Big Steep Contract based

34

upon such an obviously erroneous interpretation of the applicable "statutory load limits" is itself grievous legal error and should be reversed by this Court.

### C.    CBCA erred in determining that the alleged violations were a flagrant disregard of the contract terms.

Finally, based on the facts before it, the CBCA erred as a matter of law in determining that the Big Steep Contract could be terminated, as Mr. Miller's purported violations, if any, certainly did not amount to a "flagrant disregard" of the terms of the contract. The interpretation of contract terms is undeniably a question of law, see *McHugh v. DLT Solutions, Inc.*, *supra*, and a determination whether certain actions fall within the ambit of contract terms is without a doubt an interpretation of contract terms and may be reviewed de novo by this Court.

The Big Steep Contract provides in clause B9.31(c) that the contract may be terminated only if Mr. Miller "[h]as engaged in a pattern of activity that demonstrates a *flagrant disregard* for the terms of the contract . . . ." (A000626) (emphasis added). The contract provides no specific definition of "flagrant disregard," nor did the CBCA provide what definition it used for "flagrant disregard." But a "flagrant" act is defined as a "conspicuously offensive" act or an act "so obviously inconsistent with what is right . . . as to appear a flouting of the law . . . ." *Merriam-Webster's Collegiate Dictionary,* (11th Edition, 2006).

35

The CBCA concluded that Mr. Miller's alleged transgressions regarding load limits, haul route deviations, and delay notifications amounted to "flagrant violations" of the contract terms. (A000029). This interpretation of the contract is clearly legally erroneous, as explained more fully below.

## 1. Alleged load limit violations do not constitute "flagrant disregard" of the contact terms.

The alleged load limit violations do not constitute a "flagrant disregard" of the contract terms. As described in the preceding section, the Big Steep Contract requires adherence to "statutory load limits." The only applicable "statutory load limits" are those set out in Section 61-10-107, Mont. Code Ann., and that statute does not impose a blanket 80,000-pound load limit.[1] The statute instead determines maximum load limits according to a formula taking into account the configuration of length and number of axles of a truck and trailer.

At most, the record reflects that Mr. Miller and Mr. Emery were in an honest disagreement as to what "statutory load limits" applied to the contract. Both agreed that the Montana statute applied, but it was the interpretation of that statute where the disagreement arose. Even if this Court were to find Mr. Miller's interpretation was not the proper one, it cannot be said he was "flouting" the contract terms.

---

[1] *See* § B, *supra*.

Mr. Miller received only one citation by DOT for an overweight truck. However, that citation was based upon an analysis of the truck and trailer length and axle configuration—certainly an acknowledgment that simply using the weight of the truck and trailer does not provide a basis for a violation of the "statutory load limits" imposed by § 61-10-107, Mont. Code Ann. (A001123 – 1124, A002188 – 2190). Further, as testified to by Mr. Miller's driver, the DOT Officer noted that the load would not have been in violation and overweight had the driver remembered to extend the load. (A002188 – 2190). This one violation does not constitute a flagrant disregard for the contract terms.

Further, the Agency's notifications of breach regarding load limits do not recite any truck / trailer length and axle configuration and thus no determination of truck / trailer weight is made in accordance with Section 61-10-107. (A000239 – 240). Thus, without the requisite information on truck / trailer length or axle configuration, there was no evidence upon which the CBCA could determine that Mr. Miller actually was in violation of the contract's terms as alleged by the Agency—and without such information, it certainly cannot be said that the Agency met its burden of proof as to the issue of correctness of its notices of violation, or that such purported violations could amount to "flagrant disregard" of the contract terms.

Because the Agency's notices of violation, based on the statutory rubric contained at Mont. Code Ann. § 61-10-107, do not provide information sufficient for the CBCA to determine there actually was a load weight violation by Mr. Miller, clearly these circumstances do not amount to acts so obviously inconsistent with the terms of the contract, or so conspicuously offensive to the contract, as to constitute "flagrant disregard" of the contract terms. The CBCA erred in concluding otherwise, and this Court should, therefore, reverse its decision.

### 2. Haul route deviations and delayed notifications of delay do not constitute "flagrant disregard."

Mr. Miller's alleged deviations from the route of haul and delays cannot constitute "flagrant disregard" for the terms of the Big Steep Contract but, instead, demonstrate Mr. Miller's repeated good-faith efforts to comply with the terms of the contract. Specifically, the Agency's second January 14, 2011 Notification of Breach to Mr. Miller took Mr. Miller to task for alleged deviations from the designated haul routes and for delays in notifying the Agency when log loads were delayed more than 12 hours in reaching a weighing location. (A000242). However, neither is the case.

Mr. Miller testified, without refutation, that an alleged deviation from the haul route and delay in reaching the weighing location for a log load was due to one of Mr. Miller's drivers being forced to turn his loaded truck around when he

38

became ill.  (A002299 – 2300).  Mr. Miller also testified, once again without

refutation, that loads were sometimes delayed due to DOT regulations limiting the

number of hours a truck driver may drive or due to weather related issues.

(A002310 – 2312).  However, Mr. Miller further testified that he always notified

the contracting agent as soon as practicable upon learning of such delays, taking

into account the lack of cell phone service in the area.  (A002306 – 2308).

Even if the actions of Mr. Miller regarding the haul route deviation and

delay in reporting notification delays were breaches of the contract, these instances

do not present acts so obviously inconsistent with the terms of the contract, or so

conspicuously offensive to the contract, as to amount to a "flagrant disregard" of

the contract terms.  Instead, the complained-of actions represent, at most, only

technical violations of the terms of a contract, which were impractical given the

nature and location of the contract in remote and isolated northwestern Montana.

As such, the CBCA erred as a matter of law in concluding otherwise, and its

decision should be reversed.

> **D.** **CBCA's conclusion of law as to its burden of proof constitutes legal error.**

Finally, the CBCA's decision should be reversed because, as a matter of law,

the Agency failed entirely to proffer evidence sufficient to demonstrate that it

properly and correctly terminated the Big Steep Contract.  In order for a Court to

uphold its decision, the Agency has the burden of proof to demonstrate the correctness of the termination of the contract. *See, Lisbon Contractors, Inc. v. U.S.*, *supra*. Here, the Agency attempted to meet this burden by relying upon a patently wrong interpretation of the applicable Montana statute, and by failing to properly apply the applicable Montana statute when the Agency issued notifications of breach to Mr. Miller for overweight loads.

First, the Agency's contracting officer wrongly interpreted Montana statute to impose a blanket 80,000-pound statutory load limit.  (A002028 – 2029, A002114, A002137 – 2138).  However, § 61-10-107, Mont. Code Ann., plainly and patently on its face imposes no such blanket limit—and no such blanket limit is found anywhere in Montana statutes or regulations.[2]  Compounding the error, the contracting officer, though relying upon Montana statute, failed to properly apply § 61-10-107 and ignored the statute's requirement for a length and axle analysis to determine the maximum allowable load limits for Mr. Miller's logging trucks. (A000239 – 240, A001027 – 1094).

The CBCA based its conclusion that the Agency met its burden of proof regarding the correctness of its termination of the Big Steep Contract on these decidedly erroneous Agency actions regarding Mr. Miller's alleged overweight

---

[2] In fact, the Administrative Rules of Montana allow up to 131,000-pound loads for combination vehicles (truck/trailer with a pup) with "divisible" loads. *See* Mont. Admin. R. 18.8.431

loads.  (A000029 – 30).  The CBCA's determination, however, rests upon the foundation of sand of those erroneous Agency actions and cannot be sustained.  As such, the Court should reverse the CBCA's determination as erroneous as a matter of law.

## CONCLUSION AND RELIEF REQUESTED

For decades Mr. Miller made a living as a sole or small company logger doing business with the Agency in Lincoln County, Montana.  It is how he provided for his family and put food on the table.

Was it difficult to comply with the intricate terms of the timber sale contracts from time to time?  Yes, it was.  Was it difficult to find reliable employees in remote Montana?  Yes, it was.  Did inclement weather in the winter months in the high elevation covered under the Big Steep Contract present challenges?  Yes, it did.  Were snow and snow covered roads a constant problem?  Yes, they were. Did the fact that, often times, Mr. Miller did not have cell phone service hinder his ability to perform explicitly the terms of the contract? Yes, it did.  Did Mr. Miller have any reason to "flagrantly disregard" the terms of the contract?  Clearly, no, he did not.

What is clear from the facts is that the little guy trying to provide for his family was thwarted by an Agency that did not, or chose not to, appreciate the

inherent difficulties that ANY purchaser would have encountered in performing under the Big Steep Contract, especially during Montana's winter months.

Mr. Miller had no safety net; he had no other job opportunities. To find that he "flagrantly disregarded" the terms of the contract is to find that he chose to cut off his nose to spite his face. That is simply not believable under the circumstances, nor is it what happened here. Mr. Miller was doing the best he could, the best any operator could under the circumstances. His motivation was to succeed under the contract, as he had done for 25 years under prior contracts. The unfortunate events did not constitute a disregard for the terms of the contract by Mr. Miller but, rather, are an indication of the difficulties encountered in performance of these types contracts in remote northwestern Montana. The contract itself recognized those inherent difficulties and provided ample opportunities to cure problems as they arose. The Agency's suspension and termination of the contract denied Mr. Miller the rights he had under the contract to cure the inevitable breaches. What is worse, as a matter of law (interpretation of contract terms) most of the breaches the Agency asserted as justification for termination and upheld by the CBCA just simply are not breaches of the contract.

The CBCA erred as a matter of law in concluding the Big Steep Contract imposed a blanket load limit of 80,000 pounds on Mr. Miller's logging trucks, and

that anything other than Montana law (including the 1986 Forest Supervisor's Order) fell with the meaning of "statutory limits" contained in the contract.

The CBCA erred as a matter of law in defining the valid haul routes under the contract.  Under the terms of the contract the map submitted by Mr. Miller and accepted by the Forest Service became the contracted haul routes for the project. By ignoring this contract term, the CBCA rewrote the contract and committed error.

The CBCA further erred as a matter of law in concluding the actions of Mr. Miller regarding load limits, the haul route, and delay notifications rose to the level of "flagrant disregard" of the terms of the contract.  Therefore, pursuant to 41 U.S.C. §7107(c), this Court should reverse the decision of the CBCA confirming the termination of the Big Steep Contract, determine the Agency, in fact, breached the contract when it was terminated under the circumstances, and remand this matter to the CBCA to conduct an evidentiary hearing on the issue of damages suffered by Mr. Miller by the Agency's breach.

Dated:  April 24, 2014.

/s/ R. Allan Payne
R. Allan Payne
DONEY CROWLEY P.C.
P.O. Box 1185
Helena, MT  59624-1185
Telephone:  (406) 443-2211
Facsimile:  (406) 449-8443
Email:  rpayne@doneylaw.com
*Attorneys for Appellant*

43

**ADDENDUM**
**TABLE OF CONTENTS**

**PAGE**

United States Civilian Board of Contract Appeals
     June 18, 2013 Order…………………………………………    A002

     Judge McCann Dissent……………………………………    A013



**UNITED STATES
CIVILIAN BOARD OF CONTRACT APPEALS**

CBCA 2397 GRANTED AS TO ENTITLEMENT; CBCA 2427 DENIED: June 18, 2013

CBCA 2397, 2427

EM LOGGING,

Appellant,

v.

DEPARTMENT OF AGRICULTURE,

Respondent.

Tonn K. Petersen and Robert A. Maynard of Perkins Coie LLP, Boise, ID, counsel for Appellant.

Jennifer T. Newbold, Office of the General Counsel, Department of Agriculture, Missoula, MT, counsel for Respondent.

Before Board Judges **VERGILIO**, **McCANN** (presiding), and **STEEL**.

Opinion for the Board by Board Judge **VERGILIO**. Board Judge **McCANN** dissents in part.

**VERGILIO**, Board Judge.

This opinion addresses entitlement under two docketed appeals. On April 19, 2011, the Board received a notice of appeal, docketed as CBCA 2397, from EM Logging (purchaser) concerning its timber sale contract, 01-14-01-612773, with the respondent, the United States Department of Agriculture, Forest Service (agency). This dispute involves the purchaser's request for payment of $1050, said to be its costs related to the additional transportation (out of and back to the forest) and cleaning of a piece of equipment, incurred after an authorized agency inspector initially deemed the equipment to be acceptably clean. The Board concludes that the initial inspection was inaccurate and that the equipment was not acceptably clean; the agency's errors caused the purchaser to waste efforts in retransporting the equipment. Accordingly, the additional transportation costs should be

CBCA 2397, 2427                                                                2

reimbursed to the purchaser. The costs of cleaning, however, are not to be reimbursed as the purchaser was obligated to adequately clean equipment.

On May 19, 2011, the Board received a notice of appeal, docketed as CBCA 2427, from the purchaser disputing the agency's termination for breach of the underlying contract. The Termination for Breach clause of the contract permits the contracting officer, with the concurrence of the Regional Forester, to terminate the contract for breach in the event that the purchaser has engaged in a pattern of activity that demonstrates flagrant disregard for the terms and conditions of the contract. The record demonstrates the purchaser's breach of various material provisions of the contract: the purchaser used overweight vehicles on a restricted road, failed to utilize approved haul routes, left vehicles with logs at unapproved locations while failing to provide notice required under the contract, and hauled materials over unacceptably plowed roads. Although the purchaser corrected shortcomings related to plowing, the purchaser continued to violate other contractual provisions despite its assurances that it would correct the other failings. These violations, not single occurrences, are material, pertain to the safety and security of the personnel of the purchaser and agency, as well as the public, and exhibit a flagrant disregard of contractual provisions. The Board upholds the termination for breach and denies this appeal.

## Findings of Fact

1.      With an award date of August 31, 2010, the parties entered into a scaled timber sale contract (with timber to be weighed upon removal and paid for at contract rates), under which the purchaser was to construct roads and remove included timber, with an estimated quantity in excess of 67,000 tons. This Big Steep timber sale was in the Kootenai National Forest, Rexford Ranger District, Montana. Appeal File at 527, 529.

### Unclean Equipment

2.      The contract specifies that the purchaser shall remove all soil, plant parts, seeds, vegetative matter, or other debris that could contain or hold seeds from off-road equipment prior to entry on to the sale area. Appeal File at 599 (¶ C6.351#). The purchaser received approval from an authorized agency inspector that equipment was acceptably clean, i.e., seed and debris free. Appeal File Supplement, Exhibit 1 at 29. The purchaser transported the equipment to the sale site. At the sale location, the contracting officer deemed one piece of equipment not to be acceptable (because of plant debris) and required the purchaser to remove and clean the equipment. The equipment was not acceptably clean. Transcript at 28, 42, 69, 270-76, 480-81. The record does not demonstrate that the purchaser knew at the time the equipment first was delivered to the site that the cleaning had been inadequate.

3.      The purchaser transported the equipment out of the forest, cleaned it, and transported it back.  The contractor maintains that it expended six hours total in the round-trip transportation and five hours rewashing the equipment.  Appeal File Supplement, Exhibit 8 at 2.  This five hours approximately doubles the time expended in the initial cleaning, which took between two and three hours.  Transcript at 468-70.  This amount of time further supports the conclusion that the initial cleaning was inadequate.

4.      The agency maintains that the initial inspection was performed on other than that piece of equipment taken to the site.  The purchaser contends otherwise, with a supporting affidavit and testimony from the individual who cleaned the vehicle and loaded it for transport, and the explanation that the agency inspector never left her vehicle in performing the inspection (a point not contradicted).  The affidavit and testimony of the individual who washed the equipment and witnessed the inspection are more credible than that of the inspector regarding whether or not the given piece of equipment had been inspected.  Appeal File Supplement, Exhibit 1 at 57; Transcript at 481, 487, 539-40.  The purchaser brought to the site the equipment that had been inspected and approved as clean, not a different piece of equipment.

## Restricted road and maximum gross vehicle weight

5.      In a general clause, the contract specifies that the purchaser is authorized to use existing national forest system roads when the Forest Service determines that such use will not cause damage to the roads or forest resources.  Appeal File at 545 (¶ B5.12).  The contract expressly identifies relevant portions of Road 336 Big Creek (a Forest Service development road) as a road with restrictive limitations: "All vehicles shall comply with statutory load limits unless a permit from the Forest Service and any necessary State permits are obtained prior to overload vehicle use."  Appeal File at 510 (amended restrictive road list), 572 (¶ C5.12#, Use of Roads by Purchaser (6/99), with restricted road list) (clause C5.12), 701 (map).

6.      The contract does not specify the referenced statutory load limits.  Federal statute generally imposes an 80,000 pound gross vehicle weight limit for vehicles on interstate roads.  23 U.S.C. § 127 (2006).  While the Bridge Gross Weight Formula (with maximum gross weight dependent upon wheel base and number and configuration of axles) is a recognized method of calculating maximum weights, as found in the statute and detailed in regulation, the bridge formula does not increase the 80,000 pound total gross weight maximum, inclusive of all tolerances.  23 U.S.C. § 127; 23 CFR 658.17(b), (c), (g) (2010).

CBCA 2397, 2427                                                                              4

    7.    Statute directs the Secretary of Agriculture to establish provisions relating to
the use of the national forests. 16 U.S.C. § 551 (2006). Pursuant to the statute, and
implementing regulation, 36 CFR 261.50, .54, an order dated February 24, 1986, issued by
the Forest Supervisor, identifies as a prohibited act on all forest development roads within
the Kootenai National Forest the operation of a vehicle weighing in excess of 80,000 pounds,
gross vehicle weight. Exempt from the order are those with a permit, written agreement, or
contract specifically authorizing the otherwise prohibited act. Appeal File at RE-151. This
purchaser did not possess a permit or written agreement permitting a greater weight; the
contract did not specifically authorize a greater weight. The record contains no superseding
order or indication that this order was no longer in effect. Appeal File at RE-107.

    8.    Montana permits trucks to be operated on highways under its jurisdiction with
gross vehicle weights in excess of 80,000 pounds, with the maximum weight determined by
the bridge formula. Montana Code Annotated (MCA) §§ 61-10-107, 61-10-110 (2011).
Montana law recognizes the 80,000 federal gross weight limit, but requires particular
additional fees for vehicles with capacities in excess thereof. MCA § 61-10-201.

    9.    By letter dated November 30, 2010, the contracting officer informed the
purchaser of its obligations to comply with statutory load limits and clause C5.12. A truck
and truck and trailer with gross weights of 94,300 and 95,000 pounds, respectively, were
noted as being 14,300 and 15,000 pounds above the legal weight limit. "These weights
exceed the legal allowable weights for the bridges accessing the Big Steep timber sale."
Appeal File at 738. In letters dated November 30, and December 1 and 2, 2010, the
contracting officer asked the purchaser to explain how it would guarantee that log truck
weights will be at 80,000 pounds or less in accordance with gross vehicle weight
requirements. Appeal File at RE-423, RE-430-31, RE-436-38.

    10.    In response, the purchaser indicated that it could legally haul 80,000 pounds
with its trucks, and 84,500 pounds with its trucks and trailers. Further, the purchaser stated
that it could legally haul an additional 10% of these figures because of a state tolerance.
Appeal File at RE-426, RE-445. The record and Montana code do not support the assertion
that the purchaser legally could violate weight maximums, which are inclusive of tolerances.

    11.    In a responding letter dated December 1, 2010, the contracting officer provided
direction:

    You are required to keep your truck load weights at 80,000 lbs or less for a
    normal log truck and at 84,500 lbs (based on ax[le] spacing) for a truck and
    mule trail (pup). Exceeding these weights violates the legal load limits for the

                                          A005

CBCA 2397, 2427                                                                    5

    two bridges on the route accessing the Steep Creek timber sale. There is no
    10% tolerance above these weights.

Appeal File at 750. The letter also noted that the purchaser had failed to explain how it
would guarantee that the truck log weights will be at 80,000 pounds or less; the purchaser
simply had stated that it would work harder to maintain loads at given weights. The
contracting officer specified: "You either do it, or do not haul. Please explain how you will
guarantee that weights will comply with the contract[.]" Appeal File at 751. A letter dated
December 2, 2010, from the contracting officer to the purchaser is of similar effect with
respect to the weight issue. Appeal File at RE-437.

    12.    In a letter dated December 14, 2010, to the purchaser, the contracting officer
specified that he had earlier instructed the purchaser:

    "You are required to keep your truck load weights at 80,000 lbs or less for a
    normal log truck and at 84,500 lbs (based on ax[le] spacing) for a truck and
    mule train (pup). Exceeding these weights violates the legal load limits for the
    two bridges on the route accessing the Steep Creek timber sale." You were
    told that you would haul legal loads or your hauling would be suspended.

Appeal File at 132.

    13.    In December 2010, the purchaser sought to obtain permits to exceed gross
vehicle weight limits for its log hauling. Appeal File at RE-484. By letter dated
December 22, 2010, the contracting officer denied the request: "The load limits are there to
protect the public's investment in the roads and bridges that are improvements on the
National Forest. The roads and bridges were designed to handle legal GVWs [gross vehicle
weights]." Appeal File at RE-487.

    14.    In a notification of breach dated January 14, 2011, to the purchaser, the
contracting officer identified three trucks and three trucks with trailers with hauls between
December 20, 2010, and January 6, 2011, with gross vehicle weights in excess of 80,000 and
84,500 pounds, respectively. In identifying these instances of breach of the contract, the
letter also stated: "Hauling overweight loads across Forest Service roads and bridges from
the Big Steep Timber Sale area is also in non-compliance with of [sic] Standard Provision
**B6.22 Protection of Improvements**, due to its impact on National Forest System resources
(bridges) that are rated for legal highway loads." Also, "Because of the risk of damage to
National Forest bridges and safety concerns related to overweight trucks, you are to provide
the information in Item 1 [including vehicle identities and legal gross vehicle weights as
designated by the Montana Department of Transportation] by January 20, 2011, and trucks

are to be within legal limits immediately. Failure to comply will result in suspension of hauling activities immediately." Appeal File at 182-83.

15.     Between November 15, 2010, and January 21, 2011, the purchaser hauled over the restricted road, at least 31 times (7 for truck; 24 for truck with trailer) with gross vehicle weights in excess of 80,000 pounds (all of these truck with trailer weights were also greater than 84,500 pounds); of these truck with trailer weights, 6 times the weight was in excess of 100,000 pounds. Appeal File at RE-108-11.

16.     On January 20, 2011, a driver hauling logs for the purchaser was charged by the state with violating the bridge formula in the Montana code (specifically by exceeding the maximum gross weight allowed for any group of axles). This violation occurred on a state road, with the purchaser's truck-trailer combination having a gross vehicle weight of 102,820 pounds. Appeal File at RE-128-29, RE-133. For this violation, the driver was sentenced and fined. Appeal File at RE-132. An agency incident report, prepared by a Forest Service law enforcement officer (LEO), related to this occurrence (the haul route included the restricted Forest Service road) identifies three offenses based on his contemporaneous observation: under state laws the truck was overweight; hauling overweight load of logs across Forest Service bridges with weight limits of 80,000 pounds violated regulation (36 CFR 261.54(d)); and use of a nylon strap wrapper when a cable or chain wrapper was required under regulation. Appeal File at RE-119-20. The purchaser's explanation, that had it lengthened this truck it would have complied with Montana code and the bridge formula, is not borne out by the facts in the record, as the purchaser has not demonstrated the potential length of the truck and trailer used in the hauling.

17.     The purchaser's vehicle registrations, provided to the agency on January 27, 2011, indicate a declared maximum gross vehicle weight for its standard trucks of 100,000 pounds (valid through January 31, 2011 or 2012) and for its trailers of zero pounds. Without permits, the purchaser was not to haul additional weight on Montana roads. Appeal File at RE-544-51; MCA § 61-10-233.

Haul route and overnighting trucks

18.     The Route of Haul (10/04) clause of the contract required the purchaser to provide a map and written explanation of the haul routes it would use to remove timber from the sale area. Further,

> Upon advance written agreement, other haul routes may be approved. All
> products removed from Sale Area shall be transported over the designated
> routes of haul. Purchaser shall notify Forest Service when a load of products,

CBCA 2397, 2427                                                                 7

> after leaving Sale Area, will be delayed for more than 12 hours in reaching
> weighing location.

Appeal File at 608 (¶ C6.849). Use of approved haul routes enabled the agency to better
ensure the accountability of the timber and the safety of the logging operation.

    19.    Initially, the purchaser provided with its plan of operations a map highlighting
basically all roads off the site as potential haul routes, as it desired never to be found in
violation of this clause; the purchaser provided no written explanation or plan. The agency
received the plan and map on September 27, 2010. Appeal File at 48-53; Transcript at 602
(the president of the purchaser testified that, because of an incident under a different contract,
"I've highlighted all these roads on this map so that wherever I am, I'm never off my haul
route"). The contracting officer rejected such an approach and required a written plan that
was in accordance with the contract requirements. Appeal File at 56 (letter dated Sept. 30,
2010).

    20.    Thereafter, by letter dated October 24, 2010, the purchaser provided a written
haul route plan, with a request to be allowed twenty-four, instead of the twelve, hours to
present loads for scaling, so as to keep drivers within regulatory requirements of logging no
more than eleven hours in any twenty-four hour period. Appeal File at 80. By letter dated
November 3, 2010, the contracting officer accepted the proposed haul routes, with a specific
limitation; the contracting officer did not approve hauling to the purchaser's site in Eureka.
In the letter, the contracting officer also expressly refused to waive the requirement for
notification for delivery of loads beyond twelve hours. Appeal File at 82. Although credited
by the dissent and given dispositive weight, the testimony of the purchaser's president, in
response to often leading questions as to the dates and sequence of events surrounding the
haul map and written plan, Transcript at 600-02, is contravened by the written record as
noted in these findings.

    21.    On December 7, 2010, the purchaser wrote to the contracting officer, stating
that it planned on loading logs so that it would get them to the mill in time (weighing stations
were at mills, which closed in the late afternoon, such that any delay in arrival one day meant
at least a twelve hour delay until the mill reopened) and that it would provide notice in the
event of a delay. Appeal File at 801.

    22.    During performance, the purchaser deviated from the designated haul routes
and violated the twelve-hour limitation. The purchaser overnighted trucks at locations not
approved by the agency. Appeal File at 134, 151-52, 218. The purchaser's testimony that
hauling did not deviate from the haul map is not relevant, given that hauling deviated from
the approved written plan by hauling on a road expressly not approved. Transcript at 607;

CBCA 2397, 2427                                                                                    8

Appeal File at 82. In reference to one incident of overnighting a truck at a location off the
sale site before being weighed, without prior notification and without an approved location,
an agency employee expressed concerns in an agency-internal email message:

> This is another example that purchaser is pushing us and expects no action on
> our part. We're way too early in this sale to continue allowing these situations
> to continue to occur. With all the warnings purchaser has received regarding
> various situations on this sale, he should expect to be breached! Also, [the sale
> administrator] and I spoke this a.m. because the Resource Tech at D-1 is out
> until Thurs and we need to get trucks input for December statements which we
> will run next week, he checked tickets received within the last day or so and
> we are still seeing overweight tickets--also breachable.

Appeal File at 151.

Snow plowing

23.    Inspection reports indicate few incidents of unacceptable plowing at the time
hauling was occurring. Appeal File at 326 (November 20, a Saturday, no hauling; some
plowing had been done, but plowing not satisfactory at that time) 325 (November 24, fifteen
to twenty inches of snow; haul route plowed), 327 (November 29, hauling on roads before
plowed; some roads plowed, others not); 329 (December 9, holes not punched in snow berms
along haul route). On December 2, 2010, the purchaser had not adequately plowed roads.
Appeal File at 758, 765. An inspection report dated December 13 notes that a haul route was
properly plowed, with berms plowed off, but that a grader had made only one pass above a
given area on another road. Thereafter, the agency's inspection reports from December 17
through January 21 indicate that roads were properly plowed (either by expressly so stating
or by silence concerning road conditions). The instances of inadequate plowing or hauling
over unplowed roads are few, but significant as unplowed roads pose a safety hazard. By
mid-December at the latest, the purchaser was properly plowing roads.

Breach of contract clause

24.    The contract contains a standard Termination for Breach clause:

Contracting Officer, with the concurrence of the Regional Forester, may
terminate this contract for breach in the event Purchaser: . . .

A009

CBCA 2397, 2427                                                                          9

      (c)     Has engaged in a pattern of activity that demonstrates flagrant disregard for the terms of this contract, such as, but not limited to, repeated suspensions for breach pursuant to B9.3 . . . .

Damages due the United States for termination under this Subsection shall be determined pursuant to B9.4.

Appeal File at 566-67 (¶ B9.31). The referenced clause B9.3 discusses a purchaser's breach of any material provisions of the contract, with the agency providing notice thereof and an opportunity to remedy the breach, and the agency's suspension of the purchaser's operations under the contract. Appeal File at 566.

      25.    By letter dated March 11, 2011, to the purchaser, the contracting officer issued a notification of termination for breach. The notification specifies that the termination is a result of repeated and ongoing disregard for the terms of the contract almost from the start of logging and hauling operations. The termination identifies earlier notifications under the contract of breach and suspension relating to sanitation and servicing, use of roads, route of haul, snow removal, and payments not received. Appeal File at 1. The Regional Forester had concurred in the determination. Appeal File at 6.

      26.    The purchaser largely blames the contracting officer and sale administrator for their insistence that the purchaser comply with contract requirements. The tension between the parties arose early, as described in an agency-internal email message by the sale administrator (SA):

[U]nless I can feel safe on this sale, along with knowing the public is safe too, I will not be the Sale Administrator. Yesterday I had overweight trucks hauling on half ass plowed roads with their tires falling off. Yes [the purchaser] is shutdown at this time. But to let him start back up and have myself as the SA there will need to be actual changes from [the purchaser] and his crew. He was giv[en] many chances to perform. I will not be a lab rat to [the purchaser].

Appeal File at 773.

## Discussion

### CBCA 2397

The contracting officer acted appropriately in inspecting the equipment at the sale area; such was in keeping with the contractual direction to prevent the spread of weeds. The record, which includes photographs of the equipment taken on site at the time of the inspection by the agency and testimony of those viewing the equipment (including the contractor's employee who did the washing), supports the contracting officer's conclusion that the equipment was unacceptable. Given the contractor's unclean equipment, the contracting officer appropriately issued a notification of breach and did not permit further performance until the equipment was acceptably cleaned. However, the record does not demonstrate that the purchaser knew at the time the equipment was delivered to the site that the cleaning had been inadequate. Contrary to the agency's assertion, the record fails to demonstrate that the purchaser's delivery of the unclean equipment at the start of performance was a flagrant violation of the contract.

The purchaser's expenses associated with the transportation to and from the contractor's facility for cleaning were caused by the agency's inappropriate initial acceptance of the equipment; the costs of cleaning the equipment to an acceptable level were simply in fulfillment of contractual requirements. The purchaser attributes five hours of time to the rewash of the machine, which approximately doubles the time spent on the initial cleaning. This amount of time expended further supports the conclusion that additional cleaning was required.

### CBCA 2427

Factually, the record establishes that the purchaser repeatedly violated contractual requirements with respect to weight limits (both over the restricted forest service road and on Montana roads), haul routes, and providing notice of delays in getting to weigh stations. These amount to blatant and flagrant violations of material contractual provisions, given that the purchaser had sought, but was denied, deviations, and often was reminded of the requirements. The purchaser did not carry out its promises of compliance and did not correct problems over a thirty working day period of notice of breach. The removal of the volume of timber here at issue would require several hauls over the routes in question. The agency reasonably sought to enforce compliance with contractual provisions that affected the safety of the purchaser, agency, and public, and the integrity of the roads and bridges over which hauling occurred.

CBCA 2397, 2427                                                                      11

The record establishes weight limits for the roads in question. The purchaser and dissent fail to recognize the import of the explicit road restriction in the contract, the order applicable to the roads in the forest, and the various references in the record to the weight limitation of bridges used on the traveled route. While a better focused presentation and developed record by the parties would have addressed these portions of the record, the documents do merit weight as they support the agency's actions throughout performance. The contemporaneous incident report by a Forest Service law enforcement officer notes the 80,000 pound weight limit applicable to the route in question, covering a given Forest Service road and bridges. Although, as the purchaser argues, Montana allows greater weights, within bridge formula limitations, to travel over its roads, that law does not control the limitations on the forest development road in question. The purchaser violated Montana law, as evidenced by the sentence and fine to the driver, and suggested by the hauls with weights over the 100,000 pound weight identified in the purchaser's registrations.

The agency bears the burden of proof to support the termination for default. The agency has more than met its burden of proof. The contracting officer and sale administrator acted within the terms and conditions of the contract in requiring compliance. The purchaser's actions with respect to violating the requirements for load limits, notice of delays, and haul routes, each independently establish a basis that alone supports the termination for breach. The Board upholds the termination for breach.

## The dissent

Having considered and rejected the views of the dissent as not supported by the record, a few words are in order, without going into point-by-point details and rebuttals. First, regarding the maximum weight of vehicles on roads, the contract identifies the road in question as a restricted road. An agency order establishes the maximum weight at 80,000 pounds. A Forest Service law enforcement officer issued an incident report specific to performance under this contract; the report reflects this weight limit as being applicable to the road and bridges in question. The purchaser did not comply with this limit for its trucks or the slightly greater weight for a truck and trailer specified by the contracting officer. The purchaser's views are not determinative in establishing the weight limit on Forest Service roads and bridges. Second, the permissible haul routes were established by a written plan that provided specifics as to the purchaser's highlighted map. The purchaser acknowledges that it deviated from its written plan; it is not relevant that the purchaser remained on routes highlighted on its map, given that the map did not establish acceptable routes. Finally, the testimony of those who observed the equipment at the site and the photographs demonstrate that the equipment was not acceptably clean. The contracting officer acted appropriately under the contract in requiring the purchaser to remove the equipment and have it properly cleaned.

CBCA 2397, 2427                                                    12

Decision

The Board **GRANTS AS TO ENTITLEMENT** the appeal in CBCA 2397; the record has not closed with respect to quantum. The Board **DENIES** the appeal in CBCA 2427.


JOSEPH A. VERGILIO
Board Judge


I concur:


CANDIDA S. STEEL
Board Judge

**McCANN**, Board Judge, dissenting in part.

I respectfully dissent. The contacting officer terminated the purchaser's contract under clause B9.31, indicating that the purchaser "[h]as engaged in a pattern of activity that demonstrates a flagrant disregard for the terms of the contract . . . ." No such pattern exists.

The Forest Service bears the burden of proof on the issue of the correctness of the termination. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed. Cir. 1987). The Forest Service has not met this burden.

Equipment Cleaning

The majority first addresses the cleaning of the equipment. It finds the purchaser at fault for bringing dirty equipment to the site, after the contracting officer's representative had found it to be clean. The majority finds no fault with the Forest Service for a faulty inspection, or an incorrect finding of breach, or for shutting down the purchaser's operations. It does seem to come close, however, as it states that the Forest Service is liable for the extra transportation costs for the equipment (back and forth to the site) that must far exceed the cost of the additional cleaning.

A013

CBCA 2397, 2427                                                                    13

The majority's holding that the equipment was not clean is incorrect. Under the contract clause C6.351, "Purchaser shall employ whatever cleaning methods are necessary to ensure that Off-Road Equipment is free of noxious weeds. Equipment shall be considered free of soil, seed and other such debris when visual inspection does not disclose such material." The contract requires the Forest Service to make this decision, which it did before the equipment was transported to the site. Thus, under the contract the equipment was clean. The Forest Service can re-inspect the equipment. However, if it does, and requires additional cleaning, that is a change to the contract and the Forest Service must bear all costs.

### Restricted road and maximum gross vehicle weight

The Forest Service has consistently asserted in its filings that Montana statute applied to the hauling of the logs. During the hearing, the contracting officer testified, "A standard log truck with a five-axle combination under state law is – is 80,000 pounds of gross vehicle weight." Transcript at 296. During performance of the contract, the contracting officer never drew a distinction between gross vehicle weight limits for Forest Service roads and state roads. They were treated as one and the same. The contracting officer indicated, "All loads leaving your landings must comply with statutory load limits as determined by the Montana Department of Transportation." Appeal File at 183.

Enos Miller, sole proprietor of EM Logging, testified that the Montana Gross Vehicle Weight (GVW) Chart, Appeal File at 221-23, applied to all roads traveled on this contract. He further stated that he has referred to this chart for the past twenty-five years of logging and that he disagreed with the contracting officer's position, "[b]ecause this chart obviously proves him wrong." Transcript at 627. The contracting officer never disputed this statement at trial, although he was afforded the opportunity. Further, the Forest Service has never refuted, contradicted, or attempted to modify this statement in its briefing. The Montana chart shows that there is no blanket 80,000 pound weight limit for log trucks. The Forest Service has never indicated where it came up with this 80,000 pound limit. It is unclear at this point whether the Forest Service continues to maintain that an 80,000 pound weight limits exists.

In its reply brief, the Forest Service indicates, "The notifications of breach for overweight trucks were based upon the Agency's reasonable belief that the maximum GVW for Appellant's conventional trucks was 80,000 pounds." Respondent's Reply Brief at 10. This is insufficient. Purchaser's have the right to know what the requirements of a contract are, not only after trial and briefing, but during performance. That did not happen in this case. The Forest Service has failed to sustain its burden of proof.

CBCA 2397, 2427    14

The purchaser pointed out to the Forest Service that its interpretation of the load limits was incorrect. In an email message dated January 25, 2011, Enos Miller states:

> I received your certified mail on Saturday, January 22, breaching contract clause C5.12# and requesting information on our trucks and trailers. However, we are in compliance with contract clause C5.12#. In December we acquired additional equipment that gives us more axles so the loads you referred to in your letter do comply with state load limits. I dropped a communication log off at your office today so you can see my efforts to ascertain what exactly we are allowed to haul on this configuration. We are legal for up to 99,000 pounds stretched out. We are not in breach of the C5.12#.

Appeal File at 210.

> Again on January 26, 2011, Enos Miller writes:

> Acquired a three axle pup trailer from TA Trucking in December and in an effort to determine the legal weight we are allowed to haul, I called the DOT [Department of Transportation] in Helena and asked for an analysis form to get the legal weight we are allowed to haul with our six axle configuration. . . . I received an email back from [DOT officer] Joe [Labrodar] stating we can haul up to 93,000 pounds, however after a visual inspection, he told driver Dave Butts we can haul up to 102,000 pounds if we are stretched out.

Appeal File at 215.[1]

> Once again, on January 27, 2011, Enos Miller writes to the contracting officer:

> I received your letter dated January 26, 2011 and this email is to correct your wrong assumption. In paragraph three, you refer to the maximum legal weight allowed, as our "mule train" that is legal for up to 99,000. The truck that was ticketed is a log truck, pulling two trailers, for a total of seven axles. According to the Gross Vehicle Weight Chart I left for you with Pat Potter, a seven axle combination can haul up to a maximum of 130,580.

---

[1]    This appears to be a text message from Enos Miller to the Forest Service, probably the contracting officer, as that is the individual to whom his email messages were sent. It is date/time stamped 10-26-11 06:13 RCVD. This document was in the Forest Service records and made part of the appeal file by the Forest Service.

Appeal File at 918.

The majority has found other bases, not previously asserted by either party, which it relies upon to conclude that the purchaser was hauling overweight trucks, either on Forest Service roads, Montana state roads, or both. How the weight limits contained in these bases apply is unclear. Under these various bases the parties would be unable to determine when a truck was or was not "overweight."

As support for its conclusion that the purchaser was hauling overweight trucks, the majority points to the contract clause B5.12, which states: "All vehicles shall comply with statutory load limits. . . ." The majority then states, "Federal Statute generally imposes an 80,000 pound gross vehicle weight limit on interstate roads. 23 U.S.C. § 127 (2006)" This statute is inapplicable as purchaser did not haul over interstate roads. The reference to statutory load limits is to those limits imposed by the State of Montana, not the Federal Government. In any event, 23 U.S.C. § 127 does not prohibit states from allowing trucks in excess of 80,000 pounds from traveling on interstate highways within its borders. (It does deprive them of funds, however, if they do. 23 U.S.C. § 127(a)(1).)

Even if 23 U.S.C. § 127 were applicable to the situation before us, there are exceptions to the 80,000 pound limit on interstate roads in Montana for vehicles with trailers, called longer combination vehicles.[2]

General continuation rule. - A longer combination vehicle may continue to operate only if the longer combination vehicle configuration type was authorized by State officials pursuant to State statute or regulation conforming to this section and in actual lawful operation on a regular or periodic basis (including seasonal operations) on or before June 1, 1991, or pursuant to section 335 of the Department of Transportation and Related Agencies Appropriations Act, 1991 (104 Stat. 2186).

23 U.S.C. § 127 (d)(1)(A). Accordingly, 23 U.S.C. § 127 does not limit all trucks with trailers to 80,000 pounds. Furthermore, the 80,000 pound limit contained in 23 U.S.C. § 127 is meant to apply to five-axle configurations, not six or seven-axle configurations, which the purchaser was using.

---

[2] "Longer combination vehicle defined.—For purposes of this section, the term 'longer combination vehicle' means any combination of a truck tractor and 2 or more trailers or semitrailer which operates on the Interstate System at a gross vehicle weight greater than 80,000 pounds." 23 U.S.C. § 127(d)(4).

The majority next points to an order issued by the Kootenai National Forest supervisor on February 24, 1986, over twenty-seven years ago. Appeal File at RE-107. This order states that vehicles operating on Forest Service roads in the Kootenai National Forest are limited to a GVW of 80,000 pounds. The majority then states that "the record contains no superseding order or indication that this order was no longer in effect."

This order has no applicability. The contracting officer never relied on it or cited to it. In fact, in at least two directives issued by the contracting officer to the purchaser, and cited in the majority's decision, the contracting officer cites to a limit of 84,500 pounds for a vehicle truck (tractor and trailer) plus a pup trailer. This order was not being enforced in the Kootenai Forest, even if it had not been specifically rescinded by the Forest Supervisor. Since this order was in the record, but not brought to the attention of the Board or relied upon by the Forest Service, the only logical interpretation is that the Forest Service was aware that the order was not in effect. Certainly, it does not apply to this contract since the purchaser was never informed of its existence or applicability. It is incorrect for the majority to raise the applicability of this order in this case after the trial and briefing, when the Forest Service specifically declined to do so. Since we have no idea why this order is in the record, we have no reason to expect or not expect a superseding order, and its absence has no meaning.

The majority next looks to the vehicle registrations found in the record. Again, neither the contracting officer prior to the appeal, nor the Forest Service in any of its filings at this Board including its two briefs, ever referred to the vehicle registrations as a reason that vehicles were overweight. In any event, the majority states, "The purchaser's vehicle registrations provided to the agency on January 27, 2011, indicate a declared maximum gross vehicle weight for its standard trucks of 100,000 pounds . . . and for its trailers of zero pounds." The majority continues on to conclude, "Without permits, the purchaser was not to haul additional weight (over 100,000 pounds) on Montana roads. . . . Montana Code 61-10-233."

This argument is flawed. The registrations appear in the Appeal File at RE-544-51. The registrations for the trucks do say that their maximum weights are 100,000 pounds and the pup trailers' maximum weights are zero pounds. However, what the majority fails to include in its decision is that the trucks have yearly registrations with beginning dates (1/27/2011) and ending dates (1/31/2012), and include the declared GVW (100,000), and the GVW class (Class 1). On the other hand, the trailers have permanent registrations that do not include the beginning or ending dates, or the GVW, or the class. The majority's conclusion then that the total legal weight that can be carried by the trailer is zero pounds and by a truck (tractor and trailer) plus a pup trailer is 100,000 pounds is wrong.

The purpose of the trailer is to carry cargo. The statute dealing with the permanent registration of trailers divides trailers into two classes, one above 6000 pounds and one below 6000 pounds. Montana Code 61-3-321(3). Obviously, the permanent registration of these trailers is substantially more than zero and the combined registration weight of the truck and pup trailer substantially exceeds 100,000 pounds.

In arguing that vehicles were overweight, the majority states that the purchaser between November 15, 2010, and January 21, 2011:

> hauled over the restricted road at least 31 times (7 for truck; 24 for truck with trailer) with gross vehicle weights in excess of 80,000 (all of these truck with trailer weights were also greater than 84,500 pounds); of these truck with trailer weights, 6 times the weight was in excess of 100,000 pounds. Appeal File at RE-108-11.

What the majority implies here is that these weights exceeded limits of 80,000 pounds, 84,500 pounds, and 100,000 pounds. However, as explained above, such limits do not exist, and the parties were not aware of them. There is no evidence in the record that any of the loads referred to were anything other than legal. The Forest Service has demonstrated nothing to the contrary. The Montana chart, which both parties agree applies, shows that the five-axle truck weight limit is 91,750 pounds for a truck that is stretched out to seventy feet. A seven-axle vehicle stretched out to 90 feet reaches its limit at 112,500 pounds.[3]

The majority focuses on the one time that an EM Logging driver received a ticket for being overweight. EM Logging does not dispute that this incident did happen.[4] The driver,

---

[3]     In November 2010, EM Logging owned three fifty-foot long trucks. These trucks could be stretched out to 70 feet. EM Logging also had five trailers that could be attached to the trucks, increasing the overall length and number of axles. The overall length could be stretched out to about ninety feet. Transcript at 622-26.

[4]     The majority's facts relating to the Forest Service incident report of January 20, 2011, written by Law Enforcement Officer Helmrick, are misleading, or at least incomplete. The majority states that the Forest Service's report relating to this occurrence indicates that purchaser had been cited for "hauling overweight loads of logs over Forest Service bridges with weight limits of 80,000 pounds (violating regulation 36 CFR 261.54(d))." This is true. However, there is no 80,000 pound weight limit, or any weight limits at all for trucks traveling on Forest Service roads in 36 CFR 261.54(d). Accordingly, we do not know where Officer Helmrick came up with his stated 80,000 pound limit.

CBCA 2397, 2427                                                                          18

Laverne Miller, testified that he forgot to lengthen the trailer and could have avoided the
ticket had he done so. Transcript at 494. The majority states: "The purchaser's explanation,
that had it lengthened this truck it would have complied with Montana code and the bridge
formula, is not borne out by the facts in the record, as the purchaser has not demonstrated the
potential length of the truck and trailer used in the hauling." This is incorrect. The testimony
of the driver is more than sufficient to support the conclusion that the truck and trailer could
have been stretched out. There is no requirement for him to put into the record the actual
potential length of the truck and trailer. The purchaser's president has testified that all three
of his trucks stretched out to seventy feet.

        In summation, the majority's position that the purchaser violated any load weight
limitation lacks merit. The majority even admits that "Montana permits trucks to be operated
on highways under its jurisdiction with gross vehicle weights in excess of 80,000 pounds,
with the maximum weight determined by the bridge formula." So, the majority admits that
the contracting officer's asserted 80,000 pound limit for trucks (tractor and one trailer) is
erroneous. In the same paragraph, the majority makes the statement, "Montana law
recognizes the 80,000 federal gross weight limit, but requires particular additional fees for
vehicles with capacities in excess thereof. MCA § 61-10-201." It is unclear what point the
majority is trying to make here. In any event, the fact that Montana requires particular
additional fees for vehicles weighing over 80,000 pounds is irrelevant. Montana imposes
increasing fees every 2000 pounds on trucks from 16,000 pounds through 80,000 pounds.
MCA § 61-10- 201.

        The purchaser claimed that there existed a ten percent tolerance relating to weight
limitations. In response, the majority states, "The record and Montana code do not support
the assertion that the purchaser legally could violate weight maximums, which are inclusive
of tolerances." This statement is misleading. Montana statute using the term tolerance
indicates:

        61-10-144 Violation of standards – tolerance.

---

        We do know, however, that Officer Helmrick's report indicates that in December 2010,
he had received information from the contracting officer, Philip Emery, that weight slips for
the Big Steep timber sale showed that loads were as much as 14,000 pounds overweight for
Forest Service roads and for county and state roads. We do not know whether Mr. Emery
told Officer Helmrick that the weight limit for these roads was 80,000 pounds, but it certainly
seems possible.

. . . .

> (2) The operator of a vehicle or combination of vehicles may move over the highways to the first open stationary scale or portable scale on an engineered site, as defined in 61-10-141(4), without incurring the excess weight penalties set forth in 61-10-145 if the total gross weight of the vehicle or combination of vehicles does not exceed allowable total gross weight limitations by more than 10% and if the weight carried by any axle or combination of axles does not exceed the allowable axle weight limitations by more than 10%. If the vehicle or combination of vehicles is not in excess of the allowable total gross or axle weight limitations by more than 10%, the department may issue a single trip permit for the fee of $10, allowing the vehicle or combination of vehicles to move over the highways to the first facility where its load can be safely adjusted or to its destination.

MCA § 61-10-144(2). Thus, Montana does provide special, reduced penalties for weight overages of ten percent or less. When the weight is less than ten percent over a limit, there are no excess weight penalties, and for ten dollars an operator can move on to the first facility, where its load can be safely adjusted. With such treatment placed in the state code, it would seem that the Forest Service should not be overly concerned when a purchaser's truck is less than ten percent overweight.[5] The contracting officer indicated in his letter of December 1, 2010, that he checked with the Montana Department of Transportation and was told that there was no tolerance. Appeal File at 753-54.

It seems that the majority may be faulting the purchaser for seemingly agreeing that an 80,000 pound weight limit existed initially, or of not objecting to it quickly enough. Such faulting would be improper. The contracting officer cannot make up a contract requirement and have it become binding, just because the purchaser initially agrees with it or does not immediately dispute it. The requirement must have an independent contractual basis or it is invalid.

The Forest Service's and the majority's position on overweight trucks and trucks with trailers is incorrect. Under these circumstances, where the parties have agreed that the Montana GVW chart applies to both Forest Service and Montana state roads, it is inappropriate for this Board to find otherwise. It is questionable for the majority to impose

---

[5] The majority's reference to tolerances in this case is misplaced. The unknown tolerances that the majority is referring to do not include the ten percent tolerance covered in MCA § 61-10-144.

load limits on the roads traveled by the purchaser, limits that were never provided to the purchaser during performance, and never asserted at trial or in briefing.

## Haul route and overnighting trucks

As required by the contract, provision C.849, the purchaser submitted a haul map and a written general plan for hauling. The majority states that the purchaser initially submitted a haul map and the contracting officer rejected it, requiring a written plan. This is not so. The haul map was submitted on September 30, 2010, or just prior to this date. Appeal File at 56. At this point the contracting officer asked for clarification and a written haul route plan. *Id.* The written haul route plan was submitted by letter dated October 24, 2010. The written haul plan was accepted by the contracting officer by letter of November 3, 2010. Appeal File at 82. The contracting officer testified that he never rejected the route haul map. Transcript at 429. The purchaser testified that, since he did not hear anything from the contracting officer, he believed that the haul map had been approved. Transcript 607. Highway 93 to Eureka was on the haul map and the purchaser believed that he was authorized to haul on it. Transcript at 606-07. He did not become aware that he was not so authorized until he received a notice of breach dated January 14, 2011. Transcript at 606-07; Appeal File at 185. The actual routes were never finally approved or clarified, and they were not clarified at trial or in briefing. Accordingly, the Forest Service cannot establish that the purchaser ever violated the haul routes. The Forest Service has the burden of proof and it has not satisfied that burden.

The majority cites to the purchaser's overnighting trucks at locations not approved by the agency. Initially, the purchaser had requested that it be allowed to overnight trucks, and the contracting officer refused without stating a reason. As it turned out, it was very difficult for the purchaser to drive to the mills in one day. Accordingly, he was forced to overnight trucks on occasion. Obviously, he could not drive back to the site. What was he to do? Have his drivers drive all night? The Forest Service finally began to realize this. By letter dated January 15, 2011, Ms. Pat Potter, a supervisory resource specialist and contracting officer, stated: "If it is so difficult for purchaser to get a load off the sale area and into TRL mill in 1 day, I believe we need to immediately set up an overnight agreement which is specific to, for example, Libby where FS and purchaser agree, too as to secure location . . . ." Appeal File at 151. In fact, the contracting officer did finally propose an overnighting agreement that was put in registered mail and which the purchaser did not receive until after it was terminated. Thus, the overnighting of trucks should not be used as a reason to terminate the purchaser.

CBCA 2397, 2427                                                                    21

Snow plowing

        The majority refers only to inspection reports and concludes that they indicate few
incidents of unacceptable plowing at the time hauling was occurring. It concludes that "[t]he
instances of inadequate plowing or hauling over unplowed roads are few, but significant as
unplowed roads pose a safety hazard." The majority here recognizes that the plowing of
snow was done relatively well by the purchaser. However, the majority's statement that
hauling over unplowed roads is a safety hazzard *per se* is incorrect. The contract places no
restriction on "hauling over unplowed roads" and the conclusion that all hauling over
unplowed roads is a safety hazzard is incorrect.

        In the November 30, 2010, notification for breach and suspension, the contracting
officer indicated that the purchaser had violated provisions C5.316 - Snow Removal, and
B6.33 Safety. The basis for this notice of breach was in part that a road had not been plowed.
Appeal File at 738. Again, there is no requirement in the contract that the roads be kept
plowed at all times regardless of the amount of snow that has fallen, and the purchaser was
in the process of plowing the roads. Transcript at 557-58. Accordingly, there was no
violation of provision C5.316.

        Subsequently, the sale administrator inspected the roads for adequacy of plowing a
number of times and found roads unsatisfactory. However, he did not conduct these
inspections soon after the purchaser had notified him that the roads were ready for inspection.
Transcript at 572-75. The contracting officer admitted that the purchaser had been plowing
the roads, but that by the time the Forest Service inspected them, new snow had fallen.
Transcript at 408. The roads are in the snow belt and heavy snow had been falling regularly.
The purchaser's operations remained suspended until the Forest Service inspected the roads
after they were plowed and before a new snowfall. The Forest Service suspension of the
contract on November 30, 2010, Appeal File at 738, based upon improper snow removal was
improper.

                                        Conclusion

CBCA 2397

        I disagree with the majority's finding that the purchaser was at fault. As required by
the contract, the purchaser cleaned the equipment and notified the Forest Service to come and
inspect it. A representative of the contracting officer inspected the equipment and found it
to be clean. Therefore, under the contract the equipment was clean, and the purchaser
complied with all contract requirements. Subsequently, at the work-site, the contracting
officer found the equipment to be unclean. If the Forest Service inspector did a poor job

                                          A022

CBCA 2397, 2427                                                                              22

inspecting the equipment at the initial inspection, it is the Forest Service's problem, for
which the purchaser should not be penalized. If the Forest Service wanted the equipment re-
cleaned, it must bear all costs.

CBCA 2427

        The Forest Service's actions in this case are puzzling. It found purchaser's equipment
clean and approved transport to the site. Then it found the equipment dirty and blamed the
purchaser for bringing "unclean" equipment to the site. It imposed an 80,000 pound vehicle
weight limit upon purchaser based upon Montana statute that has no 80,000 pound weight
limit. The contracting officer never has explained where he came up with the 80,000 pound
weight limit. The parties agreed during performance, trial, and briefing that the Montana
GVW chart applied here to Forest Service and state roads. Accordingly, the Forest Service
has waived any argument that any other weight limits apply.

        The Forest Service did not establish what the haul routes were, yet it found the
purchaser in violation. Also, it refused to agree to allow the purchaser to overnight trucks
off-site, when the purchaser could not effectively conduct operations without such an
agreement. The Forest Service found the purchaser in violation of clause C5.316 - Snow
Removal when the purchaser was in the middle of plowing snow. It prohibited the purchaser
from conducting operations until the roads were plowed to its satisfaction, without
contractual authority to do so.

        The Forest Service has not established that the purchaser "[h]as engaged in a pattern
of activity that demonstrates a flagrant disregard for the terms of the contract" or sustained
its burden of proving that the termination was proper.

                                                        R. ANTHONY MCCANN
                                                        Board Judge

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on the 24th day of April, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered users:

> Jennifer T. Newbold
> Department of Agriculture
> Office of the General Counsel
> P.O. Box 7669
> Missoula, MT 59807
> Attorneys for Appellee Department of Agriculture
>
> Katy M. Bartelma
> U.S. Department of Justice
> Commercial Litigation Branch
> Civil Division
> U.S. Department of Justice
> Washington, D.C. 20530
> Attorneys for Appellee Department of Agriculture

I further certify that the required copies of the foregoing will be deposited with Federal Express for delivery to the Clerk, UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT, 717 Madison Place, N.W., Washington, D.C. 20439.

Dated:  April 24, 2014.

> */s/ R. Allan Payne*
> R. Allan Payne
> DONEY CROWLEY P.C.
> P.O. Box 1185
> Helena, MT  59624-1185
> Telephone:  (406) 443-2211
> Facsimile:  (406) 449-8443
> Email:  rpayne@doneylaw.com
> *Attorneys for Appellant*

# CERTIFICATE OF COMPLIANCE
## Type-Volume Litigation, Typeface Requirements, and Type Style Requirements

1.    *Brief of Appellant* complies with the type-volume limitation of

Federal Rule of Appellate Procedure 32(a)(7)(B):

> The brief contains 10,214 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.    *Brief of Appellant* complies with the typeface requirements of Federal

Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal

Rule of Appellate Procedure 32(a)(6):

> The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 with Times New Roman typeface of 14 points.

Dated:  April 24, 2014

/s/ R. Allan Payne
R. Allan Payne
DONEY CROWLEY P.C.
P.O. Box 1185
Helena, MT  59624-1185
Telephone:  (406) 443-2211
Facsimile:  (406) 449-8443
Email:  rpayne@doneylaw.com
*Attorneys for Appellant*